1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4          Plaintiff,

5      vs.                        CASE NO. 21-CR-524 KWR

6    LUIS MARISCAL-LOPEZ,

7          Defendant.

8

9

10

11          TRANSCRIPT OF JAMES HEARING

12       BEFORE THE HONORABLE KEA W. RIGGS

13     TUESDAY, JANUARY 17, 2023; 9:00 A.M.

14           ALBUQUERQUE, NEW MEXICO

15

16

17

18       Proceedings reported by machine shorthand and
     transcript produced by Computer-Aided Transcription.

19

20

21

22

Reported By:  Danna Schutte Everett, CRR, RPR, RMR, CCR 139
23            United States Court Reporter
              333 Lomas Boulevard, Northwest
24            Albuquerque, New Mexico  87102
              Phone:  (505) 348-2091
25            dannadawn@comcast.net

```
 1    FOR THE UNITED STATES:

 2         MR. NICHOLAS JAMES MARSHALL
           MR. MARK CHRISTIAN PFIZENMAYER
 3         UNITED STATES ATTORNEY'S OFFICE
           District of New Mexico
 4         201 Third Street, Northwest, Suite 900
           Albuquerque, New Mexico  87102
 5
      FOR THE DEFENDANT:
 6
           MR. RYAN J. VILLA
 7         THE LAW OFFICE OF RYAN J. VILLA
           5501 Eagle Rock Avenue, Northeast, Suite C2
 8         Albuquerque, New Mexico  87113
                and
 9         MS. SARAH M. GORMAN
           LAW OFFICES OF ROBERT D. GORMAN
10         1201 Lomas, Northwest, Suite A
           Albuquerque, New Mexico  87102
11
      Also Present:  Ms. Dinorah Gutierrez, Interpreter
12                    Ms. Melinda Gonzalez-Hibner
                      Ms. Michelle Cobb
13                    Mr. Byron Abeyta

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1     * * * * * * * * * * * * * * * * * * * * * * * * *

 2          (In open court.  Defendant present.)

 3               THE COURT:  Good morning.  Please be seated.

 4               Good morning.  We are here for a James hearing in

 5     United States versus Luis Mariscal-Lopez, 21-CR-524.

 6               Would counsel for the United States identify yourself

 7     for the record.

 8               MR. MARSHALL:  Good morning, Your Honor.  Nicholas

 9     Marshall with Mark Pfizenmayer on behalf of the United States.

10     Also at counsel table, we have FBI Agent Michelle Cobb and Task

11     Force Officer Byron Abeyta.

12               THE COURT:  Thank you.

13               Counsel for the defendant.

14               MR. VILLA:  Good morning, Your Honor.  Ryan Villa and

15     Sarah Gorman on behalf of the defendant, Luis Mariscal-Lopez,

16     who is present, in custody, utilizing the assistances of an

17     interpreter.

18               THE COURT:  All right.  Good morning.

19               We are here for the James hearing this month.

20               The Court has reviewed all of the pleadings in this

21     matter.  How would you like to start this morning on behalf of

22     the United States?

23               MR. MARSHALL:  And, Your Honor, this is the -- I'm

24     sorry -- this is the first time I've done one of these

25     hearings, and so I just -- I don't want to do the wrong format.
```

4

1   I was anticipating that we were going to call Agent Cobb in an

2   attempt to establish the conspiracy and the members of the

3   conspiracy, and then I was not sure how the Court wanted to

4   proceed with the statements, if you were going to go with the

5   agent or if we were going to argue the statements, because the

6   statements -- the body of the statements are in the

7   supplements.

8           THE COURT:  And I have reviewed all of those

9   statements.  I'll leave it up to you if you want to call

10  anyone.  I think we could probably argue them without a witness

11  unless you-all want to put a witness on the stand.  I'll leave

12  that up to you.  I'm not going to tell you how to present your

13  case.

14          MR. VILLA:  And I don't want to tell Mr. Marshall how

15  to do it either, Judge.  I know there was some question for

16  some of the statements that we identified in the briefing about

17  the timing, so there might need to be testimony about that as

18  well as who's the speaker, who's the -- who's the declarant,

19  who are they talking to.  Some of that is clear, but not for

20  all the statements.

21          THE COURT:  All right.  Well, let's start with the

22  conspiracy portion, if we could.

23          MR. MARSHALL:  Okay, Your Honor.  Then the United

24  States would call Agent Cobb to the stand.

25          THE COURT:  All right.  Watch your step up, if you

Direct Examination - Michelle Cobb

1    would, please.

2              If you would raise your right hand.

3         (Witness sworn.)

4              THE COURT:  You may be seated.  That microphone is

5    adjustable, and there is water in the pitcher if you need it.

6              You may proceed.

7                   GOVERNMENT'S WITNESS MICHELLE COBB,

8         after having been first duly sworn under oath,

9         was questioned and testified as follows:

10                        DIRECT EXAMINATION

11   BY MR. MARSHALL:

12   Q.   Can you state your name and where you work for the record.

13   A.   Michelle Cobb.  I work for the FBI as a special agent.

14   Q.   And are you familiar with the case against Luis

15   Mariscal-Lopez?

16   A.   Yes.

17   Q.   And what was your role in investigating this case?

18   A.   I was involved in this investigation from the very

19   beginning, from when it was first brought to us.

20   Q.   Okay.  And when you say that, what does that mean?

21   A.   We were notified by a task force officer, Byron Abeyta,

22   that he had some information there may be a missing person that

23   had been murdered and he may know the location of that

24   individual's body based on information that was provided by --

25   provided to him.  He notified the FBI, and that's when we

Direct Examination - Michelle Cobb

1    started to become involved in that.

2    Q.    Ultimately as part of the investigation, was it determined

3    who the decedent was, who the body was?

4    A.    Yes.  It was a Jessica Mora.

5    Q.    Now, what we're concerned about for today's hearing is

6    kind of the conspiracy, and so I want to focus a little bit on

7    that as it was charged.  Who were some of the individuals that

8    you interviewed that talked about what had occurred regarding

9    Jessica Mora and how she died?

10   A.    Those individuals were Jorge Dominguez, Jessica Romero,

11   Johnny Black, Robert Abeyta.

12   Q.    And what did they kind of describe to you as having

13   happened?

14   A.    They described to us that the victim had been friends with

15   this group; that the victim was alleged to have stolen some

16   money from Crystal Ramos.  They then utilized Facebook

17   Messenger to reach out to Jessica Mora to lure her back to

18   their home where they prepared a room where they intended to

19   torture her, where she was subsequently murdered.

20   Q.    I want to break that down a little bit.  You mentioned the

21   money.  Did they ever do anything to kind of establish that

22   Jessica Mora had taken money from them -- or from Crystal

23   Ramos?

24   A.    They did.  Crystal was contacted by her bank.  Her debit

25   card had been taken and someone had taken money out of her

Direct Examination - Michelle Cobb

1   account.  The bank did have footage -- or a photograph of that

2   individual.  Crystal went to the bank and reviewed that

3   photograph and identified that person that had taken the money

4   out as Jessica Mora, the victim.

5   Q.   You also mentioned that there was communications over

6   Facebook Messenger.  Who was doing that communications?  Like,

7   who was part of that communications?

8   A.   Communications were to Jessica Mora from Crystal Ramos and

9   her daughter J.T.

10  Q.   And J.T. was a minor at the time?

11  A.   She was.

12  Q.   And just --

13        MR. MARSHALL:  Your Honor, if -- since J.T. was a

14  minor, would you like us, for the purposes of this hearing, to

15  just call her J.T., or would you rather have us say the full

16  name?  I'm fine either way.

17        THE COURT:  I'd rather say the full name.  It's

18  easier for the Court.

19        MR. VILLA:  Okay.  And I'll also say that I think

20  she's an adult now, so I don't know if there's any more need

21  for protection.

22        THE COURT:  Thank you.

23  Q.   (By Mr. Marshal)  Who is J.T.?

24  A.   Jazmerae Torrez.

25  Q.   And what were these communications over Facebook like?

Direct Examination - Michelle Cobb

1    What were they communicating about?

2    A.   The communications, they started on January 13th of 2008.

3    They began with Jazmerae Torrez reaching out to Jessica Mora,

4    asking where she was at.  They continued on January 14th of

5    2018, where they were trying to get her to come over to their

6    residence.  She was at Buffalo Thunder Casino at the time.  The

7    messages continued through January 15th, where they came -- or

8    they went to go pick her up, so they were outside the casino

9    waiting for her to give her a ride bank to their house.

10          They discussed using drugs, having a bomb, and going

11    back over to the residence.

12          THE COURT:  Could you clarify who "they" is for the

13    Court?

14          MR. MARSHALL:  Yes.

15    Q.   (By Mr. Marshall)  And the -- When you say "they," who

16    were you -- who is "they"?

17    A.   Crystal Ramos and Jessica Torrez -- or sorry, Jazmerae

18    Torrez.

19    Q.   Okay.  And as part of your investigation, did you learn

20    that they were able to pick up Jessica Mora and bring her back

21    to Crystal Ramos's house?

22    A.   Yes.

23    Q.   And where was that house located?

24    A.   That was at 302 McKracken Lane in Española, New Mexico.

25    Q.   And who was there when they returned with Jessica Mora?

Direct Examination - Michelle Cobb

1    A.    The individuals there were Jorge Dominguez, Jessica

2    Romero, and Luis Lopez.

3    Q.    And so when they returned, that would have been Crystal

4    Ramos and Jazmerae Torrez had returned with Jessica Mora?

5    A.    Correct.

6    Q.    You also had mentioned that they had prepared a room

7    earlier?

8    A.    Yes, sir.

9    Q.    What do you mean by "they had prepared a room"?

10   A.    Through witness statements, we learned that the room that

11   Jazmerae Torrez used the day prior, they had removed all of her

12   things from that room.  They had then placed plastic and trash

13   bags in that room on the flooring and on the walls and put a

14   green lawn chair in that room.

15   Q.    And when you say they prepared it, what had they prepared

16   it for?

17   A.    They prepared it to torture and subsequently kill the

18   victim, Jessica Mora.

19   Q.    Now, let's backtrack just a little bit.  You mentioned

20   that they had prepared the room.  Had there been either

21   discussions or plans for what was going to happen?

22   A.    There had been.

23   Q.    And who was part of those plans?

24   A.    So part of those plans, most of it, from what we learned,

25   was directed by Crystal Ramos.  Luis Lopez was part of the plan

Direct Examination - Michelle Cobb

1    as well as Jorge Dominguez.  Jessica Romero was also told

2    certain things that Jessica -- or that Crystal wanted her to do

3    to participate.  Also present during those discussions was

4    Tosh, a/k/a Robert Abeyta.

5    Q.   And was there -- was there another individual named Johnny

6    Black?  Was he present?

7    A.   Yes.

8    Q.   Now, you had mentioned Jessica Romero.  Did she

9    participate in the plans?

10   A.   No.

11   Q.   What about Mr. Abeyta?

12   A.   No.

13   Q.   But were they present to hear what the plans were?

14   A.   Yes.

15   Q.   And what were those plans, according to witness testimony?

16   A.   The plans were to contact Jessica Mora to get her to come

17   to the residence.  Luis and Jorge and Romero all remained at

18   the house while Crystal -- Crystal and Jazmerae went to go pick

19   up Mora at the casino.  They were to stay at the house and wait

20   for them to get back with her.

21        When she came inside, their job was to then beat her

22   up and attack her once she had gotten inside the residence,

23   which from witness statements is what we are told occurred.

24   Q.   Now, and so that had been the plan.  From the witness

25   statements, what did -- what did you learn occurred when

1   Jessica Mora came into the house?

2   A.   So when Jessica entered the house, she was attacked -- she

3   was attacked, beaten, punched, kicked, hit.  She fell to the

4   floor.  There were descriptions that she had been beaten so

5   badly that her eye had popped out of her socket at that point.

6   She was then stripped down to her underwear and drug to the

7   room that had the plastic up on the flooring and on the walls,

8   and then placed on the green chair and tied to the chair, at

9   which point she was then continually beaten until she was

10  deceased.

11  Q.   At one point, was there a discussion that they were

12  planning to torture her?

13  A.   Yes.

14  Q.   And had there been a plan for how long they had wanted to

15  torture her?

16  A.   Crystal had wanted to keep her for about a week or so to

17  continually torture her.  She wanted to have her at her dinner

18  table watching them eat while she was sitting there, bloody,

19  and continued to torture her.

20  Q.   How long -- Was there a -- Well, I don't know if

21  there's -- Instead of being able to torture her for a week, how

22  long did it last?

23  A.   30 -- 30 minutes to an hour, roughly, seems to be the time

24  frame that we've pieced together at this point.  There were

25  numerous witnesses that said Crystal was upset that she had

1    died so quickly, that she wanted her to suffer, and she wanted

2    the torture to go on, and that she had died too easily.

3    Q.   Now, you mentioned who kind of participated once she had

4    come in the door.  Who was participating once Jessica Mora was

5    in that back room with the plastic?

6    A.   Those individuals were Crystal Ramos, Jazmerae Torrez,

7    Luis Lopez, Jorge Dominguez.

8    Q.   And what did they do to her in the back room?  What kind

9    of acts were they committing that day?

10   A.   In the back room when she was tied to the chair, numerous

11   individuals stated there was a power drill involved, where she

12   was drilled, her sides were drilled into by Crystal.  Also,

13   that she -- that Crystal had strangled her; that she would

14   strangle her until she was about to die and then let off,

15   continually do that.

16   Q.   And at some point did Jessica Mora pass away?

17   A.   Yes.

18   Q.   What did the individuals do at that point?

19   A.   At that point, they wrapped her up in the plastic that was

20   in the room.  The plastic and the trash bags.  There was also a

21   blanket that was wrapped up.  She was then drug into the

22   laundry room area of the house by Luis Lopez.

23   Q.   At some point, you had mentioned that Johnny Black wasn't

24   in the home.  At some point, does Johnny Black return?

25   A.   Yes.

1  Q.   And had he done anything to the vehicle?  Did they

2  describe him having done anything to the vehicle he returned

3  in?

4  A.   So witnesses stated that Johnny left before Jessica Mora

5  had gotten to the residence with Crystal and Jazmerae; that he

6  took Jessica Romero's vehicle during that time frame, and when

7  he came back, the back seats were laid down and there was

8  plastic in the back of the vehicle.

9  Q.   And as part of the messages, was there some sort of ruse,

10  like that Johnny Black had broken up with Crystal Ramos or

11  something to that effect?

12  A.   Yes, in the messages, they stated that Johnny had left,

13  that also Jessica Romero [sic] was missing, and indicated that

14  they had left together or there was some sort of romantic

15  involvement between them.

16  Q.   And so what did they do with Jessica Mora's remains at

17  that point?

18  A.   At that point, they put Jessica's remains in the back of

19  Jessica Romero's vehicle and they departed.  From what I know,

20  that was Johnny Black.  I don't recall who else was in the

21  vehicle.  I know Jessica Romero remained at the house.  I

22  believe Jorge Dominguez also left.  They drove the vehicle

23  around for a couple days.  That also included Crystal Ramos.

24  They drove the vehicle around, came back to the house.  They

25  then decided they needed to dispose of her remains, and so they

Direct Examination - Michelle Cobb

1    used a truck.  They packed a bunch of things in the back of the

2    truck, to include a box, a toolbox, some white buckets,

3    sleeping bags.  They wanted it to appear like they were going

4    to go camping.  They drove up into the mountains, up past

5    Alcalde, up into a very rural area, where they then attempted

6    to burn Jessica Mora's body.

7    Q.    Did they use any sort of an accelerant or anything to aid

8    in the burning?

9    A.    They did.  They used fuel.

10   Q.    How long were they up there trying to burn the body?

11   A.    They were up there for approximately six hours.  From

12   about 4:00 p.m. to 11:00 p.m., at which time some

13   helicopters -- they heard helicopters flying in the area.

14   Crystal got anxious that they were going to be caught.  At that

15   point, the body had not burned.  They then took the torso and

16   what was left of it, they put it in the box and tried to take

17   the rest of the materials that they were trying to burn up

18   there, to include a tarp and gloves and different items that

19   they felt might be of evidentiary value to the -- to law

20   enforcement in the future.  They put all those items inside of

21   the black toolbox and left that area.

22   Q.    And what time did you say that this had occurred?  Did you

23   say 4:00 to 11:00?  Was that a.m. or p.m.?

24   A.    I believe it was 4:00 p.m. to 11:00 p.m.

25   Q.    And when they were burning things, were there -- was there

Direct Examination - Michelle Cobb

1    one burn site, or were there multiple burn sites?

2    A.    There were at least two burn sites.

3    Q.    And was there something described that they were

4    burning -- What were they described as burning in the two

5    different burn sites that then you learned as part of either

6    your investigations or from the interviews?

7    A.    One of the burn sites was Jessica Mora's body.  The other

8    burn site was tarp and plastic and different items that they

9    thought might be evidence.

10   Q.    During the course of these activities, was it described

11   that they were using any sort of drugs or narcotics during this

12   time?

13   A.    Yes.

14   Q.    And what were those?

15   A.    Methamphetamines.

16   Q.    Who was described as having been up at the burn site?

17   A.    At the burn site would be Crystal Ramos, Johnny Black,

18   Luis Lopez, Jorge Dominguez, and Jessica Romero, and Jazmerae

19   Torrez.

20   Q.    All right.  You said they had collected the remains at

21   some point.  What did you do with the remains once they were

22   collecting it from the burn site?

23   A.    So the remains were placed in the box in the back of the

24   truck that they had been using.  They drove that back into

25   Española.  They then put that box -- They put some sort of

Direct Examination - Michelle Cobb

1  cement or cement mix into the box as well as some of those

2  other items, like tarp and things they tried to burn.  They put

3  that box in the backyard at that house at 302 McKracken next to

4  a shed and next to a Mitsubishi car that they had in the back,

5  where we understand the box remained for several months.

6  Q.   And at some point did they dispose of the toolbox?

7  A.   Yes.

8  Q.   And what was -- what information did you receive of how

9  they disposed of that toolbox?

10 A.   The information we received is that they took the toolbox

11 and they took it down near a river in the Ojo Caliente area and

12 that they buried it down near this river in the ground.

13 Q.   Now, at some point, did you have an opportunity to

14 interview Johnny Black?

15 A.   Yes.

16 Q.   And did he provide the -- What information did he provide

17 you?

18 A.   Johnny provided us the area that they had buried that

19 toolbox in, where we'd be able to find the rest of her remains.

20 Q.   "Her" meaning Jessica Mora?

21 A.   Yes.

22 Q.   At some point, were you -- was law enforcement able to

23 recover the remains?

24 A.   Yes.

25 Q.   And what did they find?

Direct Examination - Michelle Cobb

1  A.    We found the box in the approximate location as had been

2  described, down near the river.   The box had been run over by

3  machinery that had been kind of clearing that area, and we

4  could see inside that there was a cement sort of mixture and

5  wire wrapped around the box, as Johnny Black had described it.

6  That box was then exhumed out of the ground by our evidence

7  response team, and OMI took possession of that box, and it was

8  then taken to OMI for further testing.

9  Q.    Now, I think, to kind of jump back a little bit in time,

10 when we were talking about kind of the plan of what was going

11 to happen, did you have an opportunity to interview -- or --

12 and by "you," I mean the FBI agents.   I don't recall whether or

13 not you were part of the interview or not, but was Robert

14 Abeyta interviewed?

15 A.    Yes.

16 Q.    And what did -- What was -- What did he describe as having

17 occurred, and did he stay for everything?

18 A.    Abeyta described the plan as leading -- the week leading

19 up to when the murder occurred, that they would discuss it,

20 he'd get uncomfortable, and he would leave or they would stop

21 discussing it in front of him.   He was there when they were

22 trying to get Jessica Mora to come -- when Crystal and Jazmerae

23 were trying to get to her from the casino to come to the house,

24 at which time he left.

25 Q.    You mentioned, at some point, that there was some

Direct Examination - Michelle Cobb

1  preparations of putting up the plastic in the room.  During the

2  interviews, is anyone described as having participated in

3  helping put the plastic up, or who was described as putting the

4  plastic up?

5  A.   I recall it was Luis Lopez and Crystal Ramos.

6  Q.   At some point, was there an individual named Jonathan

7  Cordova interviewed?

8  A.   Yes.

9  Q.   And did he describe any sort of statements from Luis Lopez

10  about his participation?

11  A.   Yes.  He described a conversation they had while they were

12  incarcerated.  Luis talked about a girl that -- didn't give a

13  name, but talked about a female that he had helped murder and

14  that it had been directed by Crystal Ramos.

15  Q.   And did he mention anything to Mr. Cordova about preparing

16  a room?

17  A.   He did.  He described them putting up plastic in a room

18  that she was then killed in.

19  Q.   Did he also describe what they did with the body

20  afterwards?

21  A.   He described to Mr. Cordova that they had put it in a tote

22  and that they had taken it and they had put it in the Abiquiu

23  Lake, I believe; that they had backed a truck up and they had

24  pushed it off into the water to dispose of the box that

25  contained Jessica Mora's body.  Again, at that time, he

Direct Examination - Michelle Cobb

1   didn't -- he didn't give a name.  Mr. Cordova just knew it was

2   a female, from the conversation.

3   Q.   As part of the investigation, was there any DNA analysis

4   that returned back to Mr. Lopez?

5   A.   Yes.

6   Q.   And what was that?

7   A.   Mr. Lopez's DNA was found on a cigarette butt that was

8   found up at the burn the site where they had attempted to burn

9   Jessica Mora's body.

10  Q.   And just so we're clear, it seems like that Ms. Crystal

11  Ramos was giving, kind of, directions about what to do or

12  creating the plan.  Is that right?

13  A.   Yes.

14  Q.   And did she -- And what was it -- what was it that she had

15  then told Mr. Lopez and Mr. Dominguez that they were supposed

16  to do when she returned with Jessica Mora?

17  A.   She wanted them to attack her once she came in the front

18  door.

19  Q.   At some point, Mr. Dominguez, does he give a statement to

20  law enforcement?

21  A.   Yes.

22  Q.   And when was that?  His first statement.

23  A.   The first statement was on April 11th of 2018.

24  Q.   And in that statement, he describes the remains -- what

25  does he describe as having happened to the remains at that

Direct Examination - Michelle Cobb

1   point?

2   A.   At that time, he says that the -- that Jessica Mora had

3   been murdered and that she had been burned; there was a burn

4   pit up in the mountains up above the Alcalde area.

5   Q.   Does -- Did he describe, also, that -- that -- what they

6   had done with the toolbox at that point?

7   A.   I don't recall in that conversation.

8   Q.   Now, you had mentioned you interviewed Johnny Black.  And

9   was that on April 10th, 2020?

10  A.   Yes.

11  Q.   In that interview, did he describe when they had buried

12  the toolbox with Jessica Mora's remains?

13  A.   I don't recall the wording.

14  Q.   Do you recall if he said something to the effect of if it

15  was around this time of year?

16  A.   Yes.

17  Q.   During the interviews with Mr. Abeyta, does he say -- does

18  he give an approximation for how long the body was still in the

19  toolbox on the property at McKracken?

20  A.   He said it was in the back of that property for

21  approximately three months.

22  Q.   Now, there's another individual by the name of Stephanie

23  Valencia, is that correct, that kind of enters into this

24  investigation?

25  A.   Yes.

Direct Examination - Michelle Cobb

1   Q.   Was she present for kind of what had initially occurred

2   with Jessica Mora?

3   A.   From what I understand, Jessica -- or Stephanie Valencia's

4   name was that she was involved with potentially the disposal or

5   the burying of the box.

6   Q.   And was she interviewed by law enforcement at some point?

7   A.   Yes.

8   Q.   And did she describe moving heavy boxes at some point, or

9   heavy toolboxes?

10  A.   She did.  She described being in the back of the residence

11  of 302 McKracken Lane where Johnny Black and Crystal Ramos;

12  that she was helping Johnny move things in the backyard near

13  the shed, and that there was a fence back there.  She described

14  moving a heavy tool box with Johnny and that it was -- it was

15  too heavy for one individual to move.  She said she didn't know

16  what was inside the box, and she didn't ask.  She just knew

17  that it was a heavy toolbox.

18          MR. MARSHALL:  May I have a moment, Your Honor?

19          THE COURT:  You may.

20  Q.   (By Mr. Marshall)  All right.  I want to clarify just a

21  couple points.  You had mentioned that there was some of the

22  Facebook messages?

23  A.   Yes.

24  Q.   And when did those start, again?

25  A.   Those began on January 13th of 2018.

Direct Examination - Michelle Cobb

1    Q.   And when were the communications for them to kind of meet

2    up?  When did those -- What were those dates?

3    A.   January 14th into the 15th.

4    Q.   And, I mean, based on the testimony from the witnesses,

5    did that -- that meeting -- they did meet up with Jessica Mora

6    on that date?

7    A.   Yes.

8    Q.   All right.  Now, from the testimony, as part of your

9    investigation, about how long had the planning been taking

10   place before that -- the 14th and the 15th?

11   A.   Witness statements put it approximately a week.  I believe

12   that Crystal Ramos found out Jessica had stolen the money out

13   of her account right around Christmastime, and so that --

14   that's when she had that knowledge that she had stolen from

15   her.

16   Q.   And the indication from the witnesses was that there was

17   discussions about sort of a plan the week leading up to that?

18   A.   Yes.

19   Q.   Initially, had they -- had Crystal requested that Robert

20   Abeyta and Jessica Romero participate in the plan?

21   A.   Yes.

22   Q.   And did they choose -- And they -- Did they choose to

23   participate?

24   A.   No.

25   Q.   You mentioned that Mr. Abeyta left.  What did Ms. Romero

Direct Examination - Michelle Cobb

1    do?

2    A.   Ms. Romero remained at the residence.  When Crystal and

3    Jazmerae got back to the house with Jessica Mora, Romero was in

4    the back room.  Jorge Dominguez allegedly gave her some drugs

5    and told her to stay in that back room and locked her in that

6    back room.  She was not in that room when Jessica Mora was

7    being beaten and taken to the back room.  She was present in

8    the house.

9    Q.   You also had described that they had -- after burning

10   Jessica Mora's remains, they had collected it --

11   A.   Yes.

12   Q.   -- the remains?

13        Approximately how long did they keep those remains at

14   the house on McKracken?

15   A.   For approximately three months.

16        MR. MARSHALL:  Your Honor, with regards to

17   establishing the conspiracy, the participants, I would ask that

18   we pass the witness, and then I would like the opportunity then

19   to potentially re-call this witness when we get into the

20   specific statements if we meet those kind of threshold

21   questions.

22        THE COURT:  All right.  Do you have any

23   cross-examination of this witness?

24        MR. VILLA:  Yes, Your Honor.

25        THE COURT:  You may.

Cross-Examination – Michelle Cobb

1          MR. VILLA:  Thank you.
2                     CROSS-EXAMINATION
3    BY MR. VILLA:
4    Q.   Good morning, Agent Cobb.
5    A.   Good morning.
6    Q.   So let me ask you -- I'll go back to the beginning here.
7    You said that you got involved when you were notified by Task
8    Force Abeyta that he might know the location of a body or a
9    missing person?
10   A.   Yes, sir.
11   Q.   And when were you notified about that?
12   A.   I believe that was on April 11th of 2018.
13   Q.   Was that -- It sounds like Mr. Dominguez's interview was
14   before that time, his first one.
15   A.   I believe April 11th is the day that he provided that
16   information to TFO Abeyta, and we were notified the same day,
17   from what I recall.
18   Q.   I got it.  Okay.  So the statement happens first, and then
19   you get notified?
20   A.   Yes, sir.
21   Q.   So was it Mr. Dominguez's statement that initially led to
22   this investigation?
23   A.   Yes, sir.
24   Q.   At that point in time, it was not known that Ms. Mora was
25   missing or deceased?

Cross-Examination - Michelle Cobb

1   A.   At that time, she was a missing person, but it wasn't

2   known to the FBI.

3   Q.   So there was something in law enforcement database

4   identifying her as a missing person?

5   A.   Yes, sir.

6   Q.   Okay.  And if I'm understanding it correctly,

7   Mr. Dominguez is interviewed.  And then are the other

8   interviews -- do they happen after that, Ms. Romero, Mr. Black,

9   and Mr. Abeyta?

10  A.   Yes, sir.

11  Q.   Okay.  Was Jazmerae Torrez ever interviewed?

12  A.   Yes, sir.

13  Q.   Who interviewed her?

14  A.   I did.

15  Q.   Crystal Ramos was not interviewed?

16  A.   No, sir.

17  Q.   Why not?

18  A.   She was deceased.

19  Q.   Do you know when she died?

20  A.   I know it was within two to three months of when we

21  learned about -- from April 11th.  I don't recall the exact

22  date.

23  Q.   So at least once the FBI gets notified and opens its

24  investigation, which happens around April 11th, 2018, after

25  that point in time, Ms. Ramos was never interviewed because she

Cross-Examination - Michelle Cobb

1   had already died?

2   A.   That's correct.

3   Q.   Now, there is a discussion -- Or, excuse me.  There is an

4   interview of Ms. Ramos that occurs, I believe, in March of 2014

5   by a Detective Amber Marez.

6   A.   Yes, sir.

7   Q.   Do you know why Detective Marez went to interview

8   Ms. Ramos on that date?

9   A.   That was for the missing person's report that Detective

10  Marez was investigating.

11  Q.   With what agency is Detective Marez?

12  A.   At the time, I believe she was with Santa Fe County

13  Sheriff's Office.

14  Q.   At that point in time, the FBI was not involved in the

15  missing persons investigation?

16  A.   No, sir.

17  Q.   Other than that interview of Detective -- by Detective

18  Marez of Ms. Ramos, are you aware of any other interviews of

19  Ms. Ramos by law enforcement that related to this case?

20  A.   I am not.

21  Q.   I want to ask you about the Facebook Messenger.  When did

22  the FBI obtain the Facebook messages?

23  A.   I don't know the exact date.  It was in the months

24  following us opening this investigation.

25  Q.   And so generally when Facebook information is requested,

Cross-Examination – Michelle Cobb

1   it's requested for a specific user or users.  Is that correct?

2   A.   Yes, sir.

3   Q.   Which users did the FBI request information from?

4   A.   I did not request those myself.  I believe those were for

5   Jessica Mora, Crystal Ramos, and Jazmerae Torrez, but I'm not

6   entirely positive.

7   Q.   You testified on direct that there were statements between

8   Jazmerae Torrez and Jessica Mora on Facebook Messenger --

9   messages between them, correct?

10  A.   Yes, sir.

11  Q.   Were there also messages between Crystal Ramos and Jessica

12  Mora during this same time frame?

13  A.   Yes, sir.

14  Q.   And how do you know -- I guess there was -- there was a

15  suggestion, in some of our briefing, that maybe somebody was

16  using a person's account.  So, for instance, Jazmerae Torrez

17  was using Crystal Ramos's account or vice versa.  Was there

18  anything like that discovered?

19  A.   Not to my understanding, no.

20  Q.   And just so that we're clear, Jazmerae Torrez is the

21  daughter of Crystal Ramos?

22  A.   That's correct.

23  Q.   But do I understand it correctly that you believe that

24  this torture and murder occurred on January the 15th, 2018?

25  A.   I believe it's January 14th leading into January 15th that

1    this occurred.

2    Q.   Like overnight?

3    A.   Yes, sir, like in that -- in that time frame, yes, sir.

4    Q.   And you said a minute ago on direct that witnesses told

5    you that or confirmed that date.  Which witnesses?

6    A.   I don't remember which specific witness it was.

7    Q.   Let me ask a little differently.  How -- How is it that

8    you believe the murder occurred January 14th into the 15th?

9    A.   We believe that's when it occurred because that's when she

10   was taken from Buffalo Thunder Casino, and we've been told that

11   once they got her back to the residence from Buffalo Thunder

12   that that's right when it had occurred.  Also from the Facebook

13   messages, you can see that they were reaching out to her or

14   saying they're coming to pick her up, they're outside, they're

15   waiting for her.

16           There's approximately an hour gap, give or take,

17   in-between messages, at which time Jazmerae Torrez began

18   sending Facebook messages to Jessica Mora saying, "Why did you

19   jump out of the car?  Where are you?  We're not going to look

20   for you," at that time, which was about an hour or so after

21   they had gotten her from the casino.

22   Q.   How do you know they got her from the casino as opposed to

23   she jumped out of the car like Jazmerae Torrez said in her

24   messages to her?

25   A.   We have witnesses stating that she got back to the

Cross-Examination - Michelle Cobb

1  residence with the two individuals, with Crystal and Jazmerae.

2  Q.   Now -- And I want to ask about that too.  You said she got

3  back with Crystal and Jazmerae.  So do you believe it was

4  Crystal and Jazmerae that picked her up from Buffalo Thunder?

5  A.   I do.

6  Q.   So they picked her up in a car and drove her back to

7  McKracken?

8  A.   Yes.

9  Q.   Is there any other information to corroborate that besides

10 the Facebook messages and the witness statements?

11 A.   Not that I can think of.

12 Q.   Okay.  So, for instance, video from Buffalo Thunder or

13 cell phone tower location information, anything like that?

14 A.   Not that I'm aware of.

15 Q.   I'll get back to that in just a second, but let me ask you

16 this before I go.  You said Ms. Ramos had contacted her bank

17 and viewed footage showing Ms. Mora stealing money -- or using

18 her ATM card to withdraw money, correct?

19 A.   Correct.

20 Q.   That was the motive, that was why Ms. Ramos was angry with

21 Jessica Mora and did the things she did to her?

22 A.   Yes, sir.

23 Q.   At least that's what you believe?

24 A.   Yes, sir.

25 Q.   How did you know Ms. Ramos had contacted her bank and

Cross-Examination - Michelle Cobb

1  viewed footage?

2  A.   Witness statements, and we also have the photograph that

3  she was provided by the bank of Jessica Mora at the ATM taking

4  that money out of Crystal's account.

5  Q.   Who were the witnesses that said Ms. Ramos did that?

6  A.   Jessica Romero was present with her, went to the bank with

7  her when this photograph was shown.  Because at the time

8  Crystal believed that Jessica Romero was the one who had taken

9  the money from her, and so she had gone with her to view this

10 photograph, and then they identified Jessica Mora.

11 Q.   I see.  As far as you know, did anybody else go with

12 Ms. Ramos to view the photograph at the bank?

13 A.   Not to my knowledge.

14 Q.   And the photograph you obtained that Ms. Ramos looked at,

15 who did you obtain that from?

16 A.   I don't know that information.  I wasn't the agent that

17 obtained that photograph.

18 Q.   So the only one -- I guess the only folks that are living

19 that would know Ms. Ramos did that would be Jessica Romero and

20 perhaps someone at the bank.

21 A.   That were present that day?  From my understanding, those

22 are the only two people that went.

23 Q.   Okay.  And Ms. Ramos may have told other people that they

24 took that trip, but no one else was with them, as far as you

25 know?

1    A.    As far as I understand, it was just the two of them.

2    Q.    Okay.  You testified how Mr. Abeyta and Mr. Black knew

3    about this plan that Crystal Ramos had for Jessica Mora, right?

4    A.    Yes.

5    Q.    And did Mr. Black, himself, tell you that he knew about

6    the plan?

7    A.    I don't believe so.  I don't recall that information from

8    the -- from the debrief.

9    Q.    It was other witnesses that told you that Mr. Black knew

10   about the plan?

11   A.    Yes, sir.

12   Q.    Mr. Abeyta said that, right?

13   A.    Yes, sir.

14   Q.    Mr. Abeyta, he goes by a nickname Tosh?

15   A.    That's correct.

16   Q.    I think your testimony was there were discussions going on

17   for about a week prior of Ms. Ramos's plan.

18   A.    Yes, sir.

19   Q.    Right?

20         Okay.  At the time, you talked about Ms. Romero lived

21   at the house.  During this time frame, I guess, December time

22   frame when the ATM card is stolen -- Ms. Ramos finds out, and

23   then she starts talking about a plan for roughly a week -- who

24   was living at the McKracken house?

25   A.    Those individuals were Crystal Ramos, Jazmerae Torrez,

Cross-Examination - Michelle Cobb

1   Crystal's minor son at the time, Luis Lopez, Jorge Dominguez,

2   Johnny Black, and Crystal Romero.

3   Q.   You mean Jessica Romero?

4   A.   I'm sorry.  Yes.

5   Q.   That's okay.  There's a lot of --

6   A.   There is a lot of -- There are a lot of names.

7   Q.   -- similar names.  I get it.

8          Why do you believe Mr. Lopez was living at the house?

9   A.   Numerous witnesses placed him living at the residence.

10  Q.   And when you say, "living," like, did he have a bedroom of

11  his own, his own room, things like that?

12  A.   From my understanding, he had a bedroom.

13  Q.   And that's just from witness accounts?

14  A.   Yes.

15  Q.   Did you investigate whether he had any other place to live

16  at the time, whether he was renting or owning properties in the

17  area?

18  A.   Not to my knowledge.

19  Q.   And I think you said it, but I just want to clarify.

20  Mr. Dominguez also lived there?

21  A.   Yes, sir.

22  Q.   And he was he romantically involved with Jessica Romero?

23  A.   Yes, sir.

24  Q.   Now, Johnny Black was romantically involved with Crystal

25  Ramos, correct?

Cross-Examination - Michelle Cobb

1    A.    Correct.

2    Q.    Do you know how long he lived there -- I guess, let me ask

3    a better question -- at what point in time he started living

4    there?

5    A.    I don't recall the exact date.  I know Johnny Black was

6    incarcerated, and at that point had recently been released and

7    was back residing in the house with Crystal Ramos as her

8    boyfriend.

9    Q.    Do you know what car was used to pick up Ms. Mora from

10   Buffalo Thunder?

11   A.    I don't recall.

12   Q.    Do you have any reason to believe that Jazmerae Torrez

13   didn't know the purpose for picking up Jessica Mora and

14   bringing her to her home?

15   A.    Do I believe -- I'm sorry, can you restate that?

16   Q.    Sure.  Did you have any reason to believe Jazmerae didn't

17   know why they were picking up Jessica Mora to bring her back to

18   the house?

19   A.    No, sir.

20   Q.    So you believe Jazmerae Torrez knew?

21   A.    Yes, sir.

22   Q.    Because she was present when they talked about the plans?

23   A.    Yes, sir.

24   Q.    And I think you said it was her room that was the room

25   used to put down the plastic.  Correct?

Cross-Examination - Michelle Cobb

1    A.    Yes, sir.

2    Q.    And the purpose of doing that was to be able to torture

3    Ms. Mora and, you know, stop blood from collecting, things like

4    that?

5    A.    Yes, sir.

6    Q.    Do you know who prepared the room that way?

7    A.    I recall Luis Lopez and Crystal Ramos.  I don't recall if

8    anyone else assisted with that.

9    Q.    Who told you that?

10   A.    I don't recall specifically.

11   Q.    Did the person who told you that actually witness it

12   happen?

13   A.    I don't recall specifically.

14   Q.    Johnny Black was present at the home when the room was

15   being prepared?

16   A.    They put Johnny Black being there during the preparations

17   and living there.  What I know is they said he left before she

18   got there and was murdered and came back after.  I don't know

19   his whereabouts during specific events or conversations.

20   Q.    And if I understood your direct testimony, when Johnny

21   Black got back, he was in a car.  Correct?

22   A.    Yes, sir.

23   Q.    Or was it a truck?

24   A.    It was a car.  It belonged to Jessica Romero.

25   Q.    And the car had been prepared with the seats down and

1   plastic in the -- in the car?

2   A.   Yes, sir.

3   Q.   To put Ms. Mora's body in it?

4   A.   I believe so.

5   Q.   Okay.  So Mr. Black is aware of the plans, lives at the

6   house, he's ostensibly there when they prepare the room for

7   Ms. Mora.  He didn't happen to be there when Ms. Mora is

8   brought, but he comes back with a car prepared to take her body

9   and then helps dispose of the body, as I understand it.

10  A.   Yes, sir.

11  Q.   Now, are you aware that Mr. Black entered a Plea Agreement

12  with respect to some of this information?

13  A.   Yes, sir.

14  Q.   In that Plea Agreement, he did not admit to any conspiracy

15  to kidnap, murder, or torture Ms. Mora?

16  A.   That's my understanding.

17  Q.   He only had admitted to being an accessory after the fact?

18  A.   Yes, sir.

19  Q.   So as far as you understand, with the prosecution of

20  Mr. Black, it was never proven or established that he was a

21  part of any conspiracy prior to the murder?

22  A.   That's correct.

23  Q.   But the witnesses, the same witnesses you rely on for

24  these other statements told you that Mr. Black was aware of the

25  plans, was involved, lived in the house, knew what was going on

1  with Jazmerae Torrez, correct?

2  A.   Yes, sir.

3  Q.   You testified about DNA found on a cigarette butt at the

4  burn site for Mr. Lopez, correct?

5  A.   Yes, sir.

6  Q.   Was there any DNA evidence found at McKracken establishing

7  that Mr. Lopez could have been there?

8  A.   Not to my knowledge.

9  Q.   Any other forensic evidence that would establish that

10  Mr. Lopez was there?  Fingerprints?  Something else?

11  A.   No, sir.

12  Q.   Other than witness statements, do you have any other

13  evidence that Mr. Lopez was at McKracken when Ms. Mora was

14  murdered?

15  A.   No, sir.

16  Q.   Where they lived at McKracken during that time period?

17  A.   No, sir.

18  Q.   So the folks that told you about how it went down, as far

19  as Ms. Mora arrives with Jazmerae Torrez and Crystal Ramos,

20  comes in the house, she's attacked, stripped, tortured, killed,

21  and put into the truck, the folks that actually witnessed that

22  part, it's Jorge Dominguez, right?

23  A.   Yes, sir.

24  Q.   And he told you about what he saw or did?

25  A.   Yes, sir.

Cross-Examination – Michelle Cobb

1    Q.    Jessica Romero?

2    A.    Yes, sir.

3    Q.    Right?

4          Jazmerae Torrez, did she tell you that -- about that?

5    A.    No, sir.

6    Q.    So you interviewed her, but she didn't admit to any of

7    those things?

8    A.    That's correct.

9    Q.    Anyone else?

10   A.    I believe that's everyone.

11   Q.    So to clarify, Mr. Abeyta left right before Ms. Mora

12   arrived or sometime before Ms. Mora arrived?

13   A.    Correct.

14   Q.    But he believes -- When you interviewed him, or somebody

15   with your team interviewed him, he believed he was there the

16   day that Mora ultimately arrived?

17   A.    Yes.

18   Q.    But he left because he didn't want to be involved?

19   A.    Correct.

20   Q.    And Mr. Black, when he was interviewed, he didn't describe

21   any of the planning or setting up of the room or anything like

22   that, right?

23   A.    Not that I recall.

24   Q.    He didn't name anybody else that was involved?

25   A.    No, sir.

Cross-Examination - Michelle Cobb

1   Q.   He simply told you the location of the toolbox, right?

2   A.   That's correct.

3   Q.   But didn't provide any other information?

4   A.   That's correct.

5   Q.   Didn't tell you who helped him to bury the toolbox?

6   A.   No, sir.

7   Q.   Or how they got the toolbox out there?

8   A.   No, sir.

9   Q.   Didn't talk about how he showed up afterwards with

10  Ms. Romero's car with the seats down?

11  A.   No, sir.

12  Q.   Or anything that happened before Ms. Mora arrived?

13  A.   No, sir.

14  Q.   As far as what happened at, we'll call it the burn site,

15  that was told to you by Jorge Dominguez, correct?

16  A.   Correct.

17  Q.   Jessica Romero?

18  A.   Jessica Romero provided us information, yeah.

19  Q.   Did anybody else?

20  A.   I'm sorry, you named Jorge --

21  Q.   Jorge and Jessica Romero.

22  A.   I believe that's it.

23  Q.   Johnny Black didn't tell you anything about how that went

24  down?

25  A.   No, sir.

Cross-Examination - Michelle Cobb

1    Q.    Jazmerae Torrez didn't tell you?

2    A.    No, sir.

3    Q.    But the two of them were both there?

4    A.    Yes.

5    Q.    And then, allegedly, in addition to Ms. Ramos, Jorge

6    Dominguez, and Jessica Romero, Mr. Lopez was there?

7    A.    Yes, sir.

8    Q.    And that was it, right?

9    A.    Yes, sir.

10   Q.    So there's discussions about how the toolbox that was

11   found had cement in it.  Who put the cement in there?

12   A.    I don't recall who specifically put the cement in there.

13   Multiple people described the cement being put in the box.  I

14   don't recall who.

15   Q.    So you don't -- to this day, you don't know who put the

16   cement in there?

17   A.    I don't recall if we have that information or not.

18   Q.    All right.  As the story was told to you by Mr. Dominguez,

19   they were to try to burn the body as well as evidentiary items,

20   happened over a period of hours, a helicopter came, so they got

21   spooked and scooped everything up and put it into a toolbox.

22   What happened to the toolbox from the burn site?  Where did it

23   go?

24   A.    I believe the toolbox was then driven back to the

25   residence at 302 McKracken and placed in the backyard next to

Cross-Examination - Michelle Cobb

1    the fence and the shed and the broken-down vehicle.

2    Q.    And do you know at what point in time the cement was put

3    in there?

4    A.    I don't recall.

5    Q.    Is there any other evidence that you have, you know, a

6    purchase of cement, anything like that, to corroborate?

7    A.    Not that I'm aware of.

8    Q.    Now, you mentioned that a Stephanie Valencia may have been

9    involved in moving the toolbox?

10   A.    Yes, sir.

11   Q.    Who is Stephanie Valencia?

12   A.    Stephanie Valencia has a romantic relationship with

13   Jazmerae Torrez and would purchase drugs from Johnny Black when

14   he was living at 302 McKracken.

15   Q.    Did Stephanie Valencia live at McKracken?

16   A.    Not -- To my knowledge, she wasn't staying there during

17   this time frame, but afterward, she may have been staying

18   there.

19   Q.    When she -- Well, let me back up.

20          You interviewed her, and she told you about moving a

21   heavy toolbox?

22   A.    Yes, sir.

23   Q.    So it was too heavy for one person to move?

24   A.    Yes, sir.

25   Q.    Did she say who helped her move it?

Cross-Examination - Michelle Cobb

1    A.    Johnny Black.

2    Q.    Anybody else?

3    A.    No.

4    Q.    Was there cement in it at the time?

5    A.    She did not look inside the box.

6    Q.    Now, did -- was she a participant in burying the toolbox?

7    A.    The only person that I know was Johnny Black, as he didn't

8    provide any other individual's names for who helped him that

9    day.

10   Q.    And none of the other witnesses ever interviewed told you

11   who may have helped Mr. Black bury the toolbox?

12   A.    Several witnesses stated that Stephanie Valencia helped

13   Johnny Black bury the box.

14   Q.    Okay.  Who was that?

15   A.    Jorge Dominguez.  I don't -- I don't recall if it was just

16   Jorge Dominguez in numerous interviews or if it was Jorge and

17   another individual.  I don't recall.

18   Q.    Did anybody tell you that Mr. Lopez helped bury the box?

19   A.    Not to my knowledge.

20   Q.    Now, the time frame that the box is at McKracken when,

21   ostensibly, it still has the remains in there, you estimate

22   about three months, right?

23   A.    Yes, sir.

24   Q.    And that -- that's based on what Johnny Black told you?

25   A.    That's based on information provided by Robert Abeyta.

1    Q.    Okay.  What did Mr. Abeyta tell you?

2    A.    Mr. Abeyta had had a conversation with Jazmerae Torrez,

3    and she described to him that the box was still in the

4    backyard, and Tosh said that was approximately three -- it had

5    been back there approximately three months from when she was

6    murdered to when this conversation took place.

7    Q.    So as you understood it, Mr. Abeyta's having a

8    conversation with Jazmerae approximately three months after the

9    murder and she's saying the box is still here?

10   A.    Whenever this conversation took place, he's saying it was

11   there for about three months.  I don't know if the conversation

12   was three months, but they had this conversation.  She said the

13   box is back there, and he freaked out and told them they were

14   not very smart for doing that, and then in his statement to us

15   it was the box was back there for about three months.

16   Q.    So what I want to try to understand is:  Did you

17   understand Mr. Abeyta to be saying that at the time he spoke to

18   Jazmerae the box was still there, or she's telling him this

19   after the fact?

20   A.    I believe the conversation was the box is still in the

21   back of the house.

22   Q.    So as the conversation is happening, whenever it happened,

23   the box is still there?

24   A.    Yes, sir.

25   Q.    This isn't a conversation that took place after they'd

1   already disposed of the box?

2   A.   No, sir.

3   Q.   As you understood Mr. Abeyta's statement?

4   A.   Yes, sir.

5   Q.   Is there a point in time, if you learned, that Mr. Lopez

6   is no longer staying at McKracken?

7   A.   I don't recall when he stopped staying there.

8   Q.   As far as you know, he's still there during the time that

9   the box is there, or you don't know?

10  A.   I don't know when he stopped staying at that residence.

11  Q.   Do you have any information when he started staying at the

12  residence?

13  A.   I don't recall how long he'd been there.  My understanding

14  is that he was there when this entire, I guess, incident

15  happened, when Crystal found out that the money was stolen

16  leading up to the murder.  That's the only understanding I

17  have.  Yeah.

18  Q.   You talked about an interview, I guess, of John Cordova?

19  A.   Yes, sir.

20  Q.   You said he had discussions with Mr. Lopez about what

21  happened?

22  A.   Yes, sir.

23  Q.   So, first of all, when did these discussions between

24  Mr. Cordova and Mr. Lopez occur?

25  A.   This is several years after this incident occurred.

Cross-Examination - Michelle Cobb

1   Q.   And where did they occur?

2   A.   When they were both incarcerated.

3   Q.   Where was the jail they were in?

4   A.   I believe they were at Santa Fe County.

5   Q.   According to Mr. Cordova, he talks to Mr. Lopez in a jail,

6   maybe Santa Fe County, and Mr. Lopez talks about what happened?

7   A.   Yes, sir.

8   Q.   So all of those statements are a couple of years after

9   these events occurred?

10  A.   Yes, sir.

11  Q.   Mr. Cordova didn't have any other knowledge about the

12  case, just what -- this just sort of jailhouse confession?

13  A.   Yes, sir.

14  Q.   You describe how it was Crystal Ramos who was sort of

15  directing Jorge Dominguez and, allegedly, Mr. Lopez what to do

16  when Ms. Mora arrived, like to attack her when she came in the

17  door, right?

18  A.   Yes, sir.

19  Q.   Did you determine what was their reason for following her

20  orders or their motive or what -- you know, why -- why would

21  they do that for somebody, for Ms. Ramos?

22  A.   I recall information indicating Jorge was trying to

23  protect Romero, his girlfriend at the time, from being involved

24  or to protect her in some way.  As far as Luis, I -- just my

25  understanding, that he resided there.  I don't have any further

Cross-Examination - Michelle Cobb

1    information on that.

2    Q.    So the motive for Mr. Dominguez is to protect his

3    then-girlfriend Jessica Romero?

4    A.    Yes.

5    Q.    And Jessica Romero needed protection for what reason?

6    A.    Crystal and Jessica were very close friends until this

7    money was stolen, and Crystal had then accused Romero of

8    stealing that money, and their relationship drastically

9    changed.  Crystal stopped talking to her and accused her of

10   doing this, took her to the bank, and they, you know, viewed

11   that photo together, and so their relationship had just kind of

12   broken down at that point, is my understanding.

13   Q.    So is it correct, then, that Crystal wanted Jessica Romero

14   to participate in the torture of Ms. Mora?

15   A.    Yes, sir.

16   Q.    Sort of to clear this up, if you will, this accusation?

17   A.    The information I have is that she wanted her to

18   participate and she didn't want to; that Jorge participated in

19   order to protect Romero.  You know, whether that's from

20   physical harm herself, I don't know, but just to protect her.

21   Q.    So as best as you know, although while Jessica Romero was

22   there at the house on McKracken, she did not participate with

23   any of the things that took place with Ms. Mora?

24   A.    To my understanding, that's correct.

25   Q.    She was also at the burn site, correct?

Cross-Examination - Michelle Cobb

1    A.    Yes.  Yes, sir.

2    Q.    But other than being present, you don't believe she

3    participated in any way with helping destroy evidence?

4    A.    No, sir.

5    Q.    Before she was interviewed, at some point after

6    Mr. Dominguez told you guys about what happened, had she tried

7    to contact police or tell anybody what happened?

8    A.    Not to my knowledge.

9    Q.    About how many times has Jorge Dominguez been interviewed?

10   A.    Three that I know of.

11   Q.    Has he been consistent about the details in what happened

12   in each of those interviews?

13   A.    His statements have changed over time.  It may have been

14   three or four interviews.  I don't recall specifically.

15   Initially, he was distancing himself, saying this happened, "I

16   didn't participate."  Over the course of the next couple

17   interviews, he then opened up about:  "I participated.  I did

18   participate in the murder.  I was at the burn site."  But

19   initially he was trying to protect himself and wasn't saying he

20   was actually involved in it.

21   Q.    And his last interview was actually a debrief that took

22   place, I think, here at the courthouse, right?

23   A.    Yes, sir.

24   Q.    And you were present for that?

25   A.    Yes, sir.

Cross-Examination - Michelle Cobb

1  Q.   Did he say in that interview that there wasn't a plan,

2  that Mora just showed up and he just kind of reacted, there

3  wasn't really this long plan that you've been talking about?

4  A.    In the initial interviews, he said it was premeditated,

5  they were preparing for it, he was directed on what to do by

6  Crystal.  In the debrief, he said that that wasn't the case,

7  that he knew someone was coming, and when they came in, he

8  immediately attacked them.

9  Q.   He changed his story a little bit?

10  A.   A little bit, yes, sir.

11  Q.   Getting back to the Black interview -- sorry, I'm jumping

12  around a little bit -- you said that he said he buried the body

13  around this time of year.  So was he meaning around springtime

14  when you guys were actually interviewing him?

15  A.   Yes, sir.

16  Q.   So the interview, I think, took place April 10th, 2020.

17  So I just want to clarify that.  When he says, "We buried her

18  around this time of year," he means, like, April time frame?

19  A.   Yes, sir.

20  Q.   But just to be clear, he -- when he buried it would have

21  been there 2018?

22  A.   Yes, sir.

23  Q.   And when the body was discovered was in 2020 after

24  Mr. Black's interview?

25  A.   Yes, sir.

1    Q.    Because he provided directions on how to find it?

2    A.    Yes, sir.

3            MR. VILLA:  May I have just a moment, Your Honor?

4            THE COURT:  You may.

5    Q.    (By Mr. Villa)  Just one clarification.  You said earlier

6    in your cross-examination "they" put Black there before Mora

7    arrives.  Who is "they"?

8    A.    I recall that's information from Jorge Dominguez.  I

9    believe it was Jorge, Robert Abeyta, and Jessica Romero, but I

10   can't remember specifically.  It was all three of them.

11   Q.    Okay.

12           MR. VILLA:  And, Judge, with the understanding that

13   there may be more direct examination on some of the statements,

14   that's all the cross I have for now.

15           THE COURT: All right.  Thank you.

16           Before I let you ask any questions, I just have one,

17   and I may have missed it earlier.

18           Who, according to your statements that you received,

19   who was involved in the attack in the living room when Mora

20   arrived at the house?

21           THE WITNESS:  That would be Jorge Dominguez, Luis

22   Lopez, Crystal Ramos, Jazmerae Torrez.

23           THE COURT:  All right.  And who told you that

24   information?

25           THE WITNESS:  Jessica Romero, Jorge Dominguez.

Further Cross-Examination - Michelle Cobb                49

```
1            THE COURT:  All right.  Thank you.

2            Follow-up?

3            MR. MARSHALL:  Yes.  May I have a moment?

4            THE COURT:  Yes.

5            MR. VILLA:  Judge, I apologize.  I have one question

6   that I thought of as you were asking that.  If I could have a

7   minute.

8            THE COURT:  You may.  But we're not going to go back

9   and forth all day, so go ahead and ask your question and

10  then --

11           MR. VILLA:  No, I understand, Judge.  I should have

12  asked it originally.

13                    FURTHER CROSS-EXAMINATION

14  BY MR. VILLA:

15  Q.  Was Jazmerae Torrez ever charged with anything in

16  connection with this case?

17  A.  No, sir.

18           MR. VILLA:  That's all, Judge.

19           THE COURT:  Thank you.

20           Do you have anything?

21           MR. MARSHALL:  Just a few follow-up.

22           THE COURT:  You may.

23           MR. MARSHALL:  Thank you, Your Honor.

24

25
```

REDIRECT EXAMINATION

BY MR. MARSHALL:

Q.   On cross-examination, you were asked a few questions.  I
just want to kind of hone in on a couple of them.

        You were asked some questions about Johnny Black.
And is it your understanding that he has pled guilty to some
charges?

A.   Yes, sir.

Q.   And are those charges accessory after the fact, to wit,
kidnapping resulting in death?

A.   Yes, sir.

        MR. MARSHALL:  And, Your Honor, I would request that
the Court take judicial notice of the Plea Agreement -- I can
provide the Plea Agreement, if necessary, to the Court -- as
well as the information and judgment that discussed those
charges.

        THE COURT:  I will take judicial notice.  No need to
provide a copy.

Q.   (By Mr. Marshall)  At one point, defense counsel also
asked you some questions regarding Jessica Romero and Jorge
Dominguez.  Now, you mentioned that they had been in a
relationship at some point.

A.   Yes.

Q.   At some point, did that relationship end?

A.   Yes.

Redirect Examination - Michelle Cobb

1   Q.   By the time you were interviewing Jessica Romero, had the

2   relationship ended with Mr. Dominguez?

3   A.   Yes.

4   Q.   What was -- How would you characterize their relationship

5   at the point when you were interviewing Ms. Romero at that

6   point, the nature of their relationship and the feelings that

7   Ms. Romero had for Mr. Dominguez?

8   A.   Ms. -- She described they had a really volatile

9   relationship.  There was a lot of domestic violence between the

10  two of them, and it didn't seem like it was on good terms at

11  that time.

12  Q.   Also on cross-examination, defense counsel brought up some

13  of the inconsistencies from Mr. Dominguez in his statements.

14  However, did the evidence that you recovered kind of support

15  some of the statements that he made, such as were you able to

16  recover plastic from the burn site?

17  A.   Yes, sir.

18  Q.   Were you even sort of -- What other findings did you

19  recover at the burn site that were consistent with his prior

20  statements to you?

21  A.   I believe there was a part of a blanket, a

22  black-and-white-striped blanket that had been described that

23  was also potentially rolled up with the plastic.

24  Q.   Did he also describe, like, a toolbox?

25  A.   Yes.

Redirect Examination - Michelle Cobb

1    Q.   Was there -- I mean, how was -- And I think you previously

2    described it.  Were Ms. Mora's remains discovered in, like, a

3    toolbox?

4    A.   Yes.

5    Q.   Did your interviews with Mr. Abeyta and Ms. Romero, when

6    compared to Mr. Dominguez's statements, did they show

7    similarities about the people that were involved?

8    A.   Yes, they did.

9    Q.   And what about the general nature of what was alleged to

10   have occurred at 302 McKracken?

11   A.   Yes.

12           MR. MARSHALL:  May I have a moment, Your Honor?

13           THE COURT:  You may.

14           MR. MARSHALL:  No further questions for the witness

15   regarding the conspiracy and the co-conspirators.  As mentioned

16   before, if -- there may be some more questions for this witness

17   regarding the proffered statements, the co-conspirator

18   statements from the United States.

19           THE COURT:  Okay.  Thank you.

20           At this time, the Court will find that the United

21   States has proven by a preponderance of the evidence that a

22   conspiracy did exist to lure Jessica Mora and to ultimately

23   torture her and murder her.

24           Now, where would you like to go from here, United

25   States?

Redirect Examination – Michelle Cobb

1          MR. MARSHALL:  Your Honor, could we have a few

2    minutes to discuss with defense counsel if there's anything

3    that we can agree to?

4          THE COURT:  Absolutely.

5          MR. MARSHALL:  And then that way we can, hopefully,

6    expedite the remainder of the hearing.

7          THE COURT:  Absolutely.  Let me know when you're

8    ready.

9          MS. BEVEL:  Do you want to excuse the witness, Your

10   Honor?

11         THE COURT:  Oh, I'm sorry.  May this witness step

12   down?  May she be excused?

13         MR. MARSHALL:  Yes, Your Honor.

14         THE COURT:  All right.  You may step down.  I

15   apologize.

16         THE WITNESS:  Thank you.

17         THE COURT:  Thank you.

18      (Court stood in recess at 10:17 a.m. and resumed at

19      11:01 a.m.)

20         THE COURT:  All right.  Counsel, have you been able

21   to agree on any items?

22         MR. MARSHALL:  Yes, Your Honor.  We were able to

23   reach an agreement on a decent portion of them.

24         THE COURT:  All right.

25         MR. MARSHALL:  And then there is kind of, I think,

1    one major argument that will need to be had, and I think there

2    may or may not be agreement after that's cleared up, which is

3    the issue of when the conspiracy ended.  And there may be a few

4    more agreements at that point.  And then there's some that are

5    just going to be pure argument, I think by both sides.

6            THE COURT:  All right.  Well, let's start with what

7    you have agreed upon.  Can we do that?  Can you let the Court

8    know?

9            MR. MARSHALL:  Yes, Your Honor.

10           THE COURT:  Someone.  I don't care who does.

11           MR. MARSHALL:  You might have better notes.  I

12   started, I think, a couple -- and I apologize.

13           MR. VILLA:  Judge, the way we were tracking it -- And

14   is it okay if I remain seated for this?

15           THE COURT:  Absolutely.

16           MR. VILLA:  -- was using document 190, the United

17   States' second sealed supplemental brief, because I think that

18   describes what's still at issue.

19           THE COURT:  All right.  I have that in front of me.

20           MR. VILLA:  So with respect to the statements from

21   Ms. Ramos, I don't think we reached any agreements, so that was

22   Subsection A.

23           THE COURT:  All right.

24           MR. VILLA:  So moving on to Subsection B, number 2,

25   the initial description of the plan to torture.

```
 1              THE COURT:  Yes.

 2              MR. VILLA:  So with the proviso that we're not a

 3   hundred percent sure if it was J.T. or Black, right, that --

 4   who made the statement, but we know that Ramos was one of the

 5   declarants.  We do agree that that is a statement in

 6   furtherance of the conspiracy.

 7              THE COURT:  So number 2 on page 4 --

 8              MR. VILLA:  Correct.

 9              THE COURT:  -- under Jorge Dominguez?

10              All right.

11              MR. VILLA:  And then skipping to number 4 under

12   Dominguez, which starts on page 5 and goes to page 6 --

13              THE COURT:  Yes.

14              MR. VILLA:  -- the description about the plan, we

15   agree with that one.

16              THE COURT:  All right.

17              MR. VILLA:  Turning to page 10, now we're on

18   statements by Mr. Abeyta, C1, dealing with the plan --

19              THE COURT:  All right.

20              MR. VILLA:  -- we agreed to that one.

21              And then 3 and 4 for Mr. Abeyta, both on page 12.  We

22   agreed with those two.

23              THE COURT:  All right.

24              MR. VILLA:  Yeah, I think 6, with the proviso that --

25   I think the Government agreed to this -- it's Ramos and Black
```

1  are the declarants that -- the brief says on page 14, "and

2  possibly other co-conspirators."

3          THE COURT:  All right.

4          MR. VILLA:  So I think we're dropping "the other

5  co-conspirators" but agreeing that it was Ramos and Black.

6          Is that right Mr. Marshall?

7          MR. MARSHALL:  Yes.  If there was another

8  co-conspirator, I'd have to -- we'd have to either approach or

9  argue about that, but we're agreeing to Ramos and Black.

10          THE COURT:  Okay.

11          MR. VILLA:  Now turning to Jessica Romero on page 16,

12  D2, just the first paragraph in the clipped portion.

13          THE COURT:  On page 16?

14          MR. VILLA:  Correct.  The rest of it, I think we've

15  agreed.  It's just a narrative description of what happened.

16  But the first paragraph we agree to.

17          THE COURT:  So the rest of it is on page 17, correct?

18          MR. VILLA:  Well, the rest of what's in the box on

19  16.

20          THE COURT:  Okay.

21          MR. VILLA:  So the box on 16 has -- one, two, three,

22  four, five --

23          THE COURT:  So just the first paragraph only?

24          MR. VILLA:  Yes.  And then with respect to the rest

25  of those, there's no agreement.  There might be some argument

1   by the Government, I think.

2           THE COURT:  All right.

3           MR. VILLA:  So number 5 on page 18.

4           THE COURT:  All right.

5           MR. VILLA:  And then on page 20, number 7.

6           THE COURT:  All right.

7           MR. VILLA:  And with respect to the Facebook

8   statements, for both of them, there are conversations in the

9   January time frames of January 15th and then backward, 13th, a

10  few on the 9th and the 10th.  So subject to foundation, which

11  would be establishing these are these folks' Facebook accounts,

12  we agree to those; however, there are some that are in the

13  March time frame, later on, and we don't agree to the March

14  time frame, just the January time frame.

15          And to be clear for the record, those are the

16  conversations between Ms. Mora, Crystal -- Ramos is identified

17  in this as Crystal Torrez, and Jazmerae Torrez in that January

18  time frame.  January 2018.

19          THE COURT:  All right.

20          MR. VILLA:  I think those were all the agreements.

21          MR. MARSHALL:  I believe so.

22          THE COURT:  All right.  I have those marked.  Thank

23  you, counsel.

24          Now, you said there was one big argument that we

25  needed to deal with, Mr. Marshall?

1          MR. MARSHALL:  Yes, Your Honor.  I believe the first

2     kind of like big argument, and then there may still be some

3     other arguments, but is determination of when the conspiracy

4     ended.  From the Government's perspective --

5          And may I approach the podium, please.

6          THE COURT:  Absolutely.

7          MR. MARSHALL:  From the Government's perspective,

8     Your Honor, this conspiracy did not end until Ms. Mora's

9     remains were finally buried in the toolbox by the river.  And

10    you can see that part of the reason for that, Your Honor, is

11    that this plan from the very beginning dealt with them planning

12    on the disposal of the body.  By them putting up the plastic in

13    the room, they had showed kind of their intent that they were

14    going to -- part of this plan was to conceal it, that they did

15    not want blood left in their house, and to then use the plastic

16    tarps or the plastic lining to then dispose of the body.  And

17    so that their intent from the very beginning included the

18    concealment and the burial of the body.

19          Their discussions were always like, "We need to go

20    get rid of the body," the evidence, and that they went out to

21    the burn site, and then they brought it back, they brought the

22    body back in the toolbox, and that the -- it's -- there's a --

23    there's a -- The only reason it appears that Mr. Dominguez

24    continued to discuss things with Jazmerae Torrez was regarding

25    the remains, and that it's at the end of when the remains are

1    finally in the ground that the concealment is over and that

2    this conspiracy ends.

3           They are still working when it comes to -- you see

4    the discussion with Detective Marez to kind of conceal it and

5    hide.  You see the conversations that were included in -- that

6    took place between Dominguez and Mr. Abeyta, that there was

7    concern that the body had -- was not in the ground at that

8    point, and further evidence that their intent to conceal from

9    the very beginning was also that when Mr. Black arrived at the

10   scene, he -- the back of the vehicle of Ms. Romero's vehicle

11   also included that they had tarped up the back, and so that

12   there was the -- that it wasn't just to prevent staining in the

13   bedroom, but it also included the disposal of the remains and

14   the disposal of Ms. Mora's body, and that was why they were

15   going to be transporting it into the other vehicle and

16   continuing with the whole disposal process.

17          Now, initially, their plan had been, I think, to --

18   that it would have ended at the burn site, but because the

19   helicopters came and interrupted their plan to burn all of

20   Ms. Mora's remains and to kind of dispose of her body up there

21   at the initial burn site location, because it was interrupted,

22   the conspiracy continued onward until eventually they had

23   buried the body in the toolbox out by the river and kind of

24   near Ojo Caliente.

25          And so that the defense argument, I believe, is the

1    conspiracy was only to kidnap and/or kind of torture and murder
2    Ms. Mora, but from the United States' perspective it was clear
3    that they had intended to do more than that, that this
4    conspiracy was going beyond just the kidnapping and the torture
5    and murder of Ms. Mora.  It was also that it was to the
6    disposal of her remains to kind of hide any sort of evidence of
7    what they had done, which was why they also took pieces of the
8    evidence that had this separate burn site up there where they
9    were burning the other pieces of evidence.
10            And so, Your Honor, the argument is that the extent
11   of the conspiracy went from the planning phases to
12   approximately a week before January 15th, so starting early
13   January up until the body was buried, as the time frame for
14   the -- for this whole conspiracy.
15            THE COURT:  Thank you.
16            Defense.
17            MR. VILLA:  Judge, before I forget, as a preliminary
18   matter, we did argue that the pleadings that the Government
19   filed in this case should be unsealed.  The only basis they
20   identified for sealing them was Jazmerae Torrez, because she
21   was a minor at the time.  I think we've all agreed today that
22   that's no longer an issue.  So I would ask the Court to order
23   those to be unsealed.  I can certainly let Mr. Marshall respond
24   to that.
25            THE COURT:  Any objection, Mr. Marshall?

1          MR. MARSHALL:  Yes.  It was two-fold, and maybe we

2    did not make a clear argument on the second part.  The first is

3    that Ms. Torrez was a minor at the time and that it -- so she

4    does have some rights to protection.  The other is that there

5    were -- there are allegations that there's co-conspirator

6    statements, and so that there's a need to kind of protect those

7    individuals and their statements a little bit because if people

8    are deemed to be considered a snitch, per se, that it could

9    endanger them, and so that we'd ask that these also be kept

10   under seal for those reasons, so as not to lead to the people

11   that -- these other co-conspirator statements that may have

12   cooperated with the Government, so that we don't endanger them

13   in any sort of way.

14         THE COURT:  Anything that you'd like to add to that?

15         MR. VILLA:  Judge, I mean, we talked about it here in

16   open court in this public proceeding who those folks were.  I

17   understand the need to protect them to a certain point, but now

18   that we're at the place where things need to be admitted in

19   evidence, I think it needs to be public.

20         THE COURT:  I'll take it under advisement and issue a

21   ruling on that issue.

22         If you'd like to move on.

23         MR. VILLA:  Yes, Judge.  So I certainly agree that

24   the -- from Agent Cobb's testimony, there is people who at

25   least accuse Mr. Lopez of being involved in the burning of the

1    body initially, which seemed to have occurred right after the

2    torture and the murder, and so to that point, whenever that

3    ended, which I think the testimony was about six or seven

4    hours, when they then saw helicopters and Mr. Black shoveled

5    everything that was left into the toolbox, you know, there's,

6    arguably, a crime still occurring in which individuals accuse

7    Mr. Lopez.  But after that point, there isn't any evidence that

8    Mr. Lopez is involved in putting cement in the toolbox,

9    disposing of the toolbox by the river, or that he was even

10   still living at the property.  Agent Cobb didn't know, when I

11   asked her, if he was still there.  So I think with respect to

12   Mr. Lopez, the conspiracy ends after they leave the burn site.

13         And, you know, just to be clear, the Court, before we

14   took the recess, the Court ruled that you found a conspiracy to

15   lure, torture, and murder Ms. Mora, but you hadn't ruled on

16   anything else.

17         With respect to some of the arguments of specific

18   statements, I think it really just matters what the context of

19   the statement is, so we could probably just do that

20   individually.  So, for instance, there's a statement we don't

21   agree with where Ms. Ramos is alleged to have said, "We had to

22   get rid of the body, so we lit it," and the statement is

23   written in past tense.  So I don't think it matters whether the

24   Court finds the conspiracy's still continuing.  The question

25   there is, you know, did Ms. Ramos make that statement before or

1    after the fact.

2            With respect to things that happened with disposing

3    of the toolbox by the river, that may make a difference for

4    Mr. Lopez, because there is a statement where Jazmerae

5    supposedly says, "We buried it by the river."  Again, that

6    might be an after-the-fact statement, but when the conspiracy

7    actually ended is another matter.

8            There's another statement for Ms. Ramos, assuming the

9    Court gets over some of the Sixth Amendment objections, where

10   she says, you know, she went too easily, commenting that

11   Ms. Mora died too quickly, she wanted her to suffer, that

12   really doesn't matter when the conspiracy ends for the purposes

13   of that.  It's just was that a statement in furtherance of any

14   of these conspiracies.  So I do think the Court should find

15   when the other -- when the conspiracy ended, if there were any

16   other conspiracies, but with respect to these individual

17   statements, it's probably less of an issue rather than when was

18   the statement you made or was the statement furthering any of

19   the conspiracies.

20           THE COURT:  All right.  Thank you.

21           Did you have anything else?

22           MR. MARSHALL:  Just briefly, Your Honor.  I have not

23   gone into the specific statements because I thought that was an

24   argument just for the general arguments, so it's something that

25   I do.  The specifics we can.

1           The last thing I would like to argue, Your Honor, is

2   that it does not -- the case law indicates that it doesn't

3   matter when Mr. Lopez was a part of the conspiracy.  If he was

4   part of the conspiracy, he's subject to the co-conspirators'

5   statements that are made.  And that would -- you can see that

6   in the Government's brief on -- in document 63, we kind of

7   outline that, and on page 7 and some of cases that talk about

8   that, that the -- that it doesn't matter -- that he's not held

9   accountable just for the parts when he was a member of the

10  conspiracy, but the entirety of the conspiracy.

11          And so our argument was that he was still a part of

12  it, but even if he had withdrawn from the conspiracy, he's

13  still liable for the -- or he's still, yeah, liable for the

14  statements that would have been made as part of the conspiracy

15  at the time.

16          THE COURT:  There's been no evidence presented -- you

17  can go ahead and be seated -- that he had withdrawn.  I'm going

18  to agree with the United States' theory in this case that the

19  conspiracy ended with disposal of the body by burying of the

20  toolbox at the river.  So that's where I will find the

21  conspiracy ends.  I agree with that it started with the

22  planning stages and ended with the burying of the toolbox at

23  the river.

24          Now, does that -- does that change anything, or where

25  do you want to go from here?

1          MR. VILLA:  I don't think it changes our agreements,

2    Judge, but I do think it clarifies the record --

3          THE COURT:  Okay.

4          MR. VILLA:  -- and how we might argue about some of

5    these.

6          THE COURT:  All right.  So do we the want to just

7    start with the statements that you haven't agreed to and hear

8    argument?  Or do you want to do that in writing?

9          MR. VILLA:  I mean, I'm happy to, Your Honor, if

10   you'd like.  I mean, it might make sense for me to go first,

11   because we're not agreeing, and then the Government can

12   respond, or I'm happy to do it a different way.

13         THE COURT:  That sounds good to me.

14         Any objection to that format?

15         MR. MARSHALL:  No, Your Honor.

16         THE COURT:  All right.  Thank you, Mr. Villa.

17         MR. VILLA:  Yes, Judge.

18         And so, again, I'm working off of that document 190,

19   the second supplemental --

20         THE COURT:  Yes.

21         MR. VILLA:  So statements of Ms. Ramos, A1 has been

22   be withdrawn.  A2.  So we certainly will pursue our Sixth

23   Amendment argument that any statements Ms. Ramos made to

24   Detective Marez are testimonial and, therefore, inadmissible

25   because we don't have the chance to cross-examine her.  As you

1    heard from Agent Cobb, she's deceased.

2          If the Court were to overrule the objection with

3    respect to 2, this is on March 14th, 2018.  So it's not clear

4    exactly when the body was buried by the river.  Mr. Black says

5    three months.  This is right at three months.  Well, excuse me.

6    January 15th, February, March.  So this is two months.  So it

7    is possible that the body is still there.  Again, we're working

8    off of Mr. Black's estimate of three months, that he makes in

9    2020, about things that happened in 2018.

10          However, even if the Court were to assume that the

11   body is still there, these statements by Ms. Ramos to Detective

12   Marez where she's essentially saying, "Do you know" -- I mean,

13   the question is:  Do you know anybody that I could talk to that

14   still talks to her?

15          And she says, "You Know what -- When she was out

16   here -- I had heard she was out here, and I have no idea who

17   she was out here with.

18          "... she had told me she was in Albuquerque, but she

19   was here."

20          As we argued in the brief, this is Ms. Ramos

21   admitting that Ms. Mora was there on the property.  That is

22   certainly not a statement in furtherance of any conspiracy to

23   hide her body.  At this point, you know, the murder's occurred,

24   so it's not in furtherance of the kidnapping, it's not in

25   furtherance of torturing or murdering.  It can only be in

1    furtherance of disposing of the body.  And this certainly

2    doesn't further that in any way, simply denying that she knows

3    anybody that could talk to her and admitting that she was

4    there.

5             Do you want Mr. Marshall to respond?  Do you want us

6    to go one at a time like that or --

7             THE COURT:  Let's go through one person at a time.

8             MR. VILLA:  Okay.  Sure.

9             The next being number 4, the continued communications

10   and misdirection.  Ms. Ramos telling Detective Marez, I can

11   message her and see if I can get a response back, or something

12   like that, saying we haven't talked.  I'd kick her in the mouth

13   if I could.

14            These aren't in furtherance of hiding the body.  It's

15   simply -- I mean, in fact, some of these would be inculpatory,

16   I think, if Ms. Ramos were still alive, but it certainly

17   doesn't further anything.

18            I mean, the Government's argument is, essentially, if

19   Ms. Ramos doesn't admit we have a body here now, that

20   everything she says is in furtherance of hiding the body, and I

21   think that's overbroad.

22            And that would conclude Ms. Ramos.

23            THE COURT:  All right.  Thank you.

24            Would you like to respond to Ms. Ramos?

25            MR. MARSHALL:  Yes, Your Honor.  With regard to the

1    statements from Ms. Ramos to Detective Marez, our argument,

2    Your Honor, is that they would be noncustodial and

3    non-testimonial statements.  These are -- Ms. Ramos is not in

4    custody at the time.  She's -- From the video from Detective

5    Marez, you can see that she is from -- at her doorstep, and

6    that these are also not statements that were clearly made to be

7    used in a testimonial fashion, like made to be used in court.

8          Ramos had hoped that they probably would have never

9    been to court, that she never would have been caught.  And so

10   as it states in the Alcorta case, the statements that are made

11   to avoid detection from the law can come in as co-conspirator

12   statements.  Concealment is also part of a conspiracy.  And

13   those were in the Blakey and -- I'm not sure how to pronounce

14   it -- Esacove from the Eleventh and the Fifth Circuit

15   respectively.

16         So these co-conspirator statements are made to kind

17   of conceal what they had done.  She's misdirecting Detective

18   Marez in the argument, making Detective Marez believe that

19   Ms. Mora was still alive at this point.  This misdirection kind

20   of helps conceal that they -- what they had done, but also that

21   the body was still on the property.

22         The statements that we have that the body was still

23   on the property are from Johnny Black saying that it was around

24   the same time of year, which was early April -- I think it was

25   April 10th, but I may be off by a day or so, from when he was

1   interviewed, that it was this time of year.

2          Mr. Abeyta says that it was three -- that the body

3   had been there for three months, and so that would have been

4   from mid-January till mid-April.  But also we know from -- I

5   believe a statement from Mr. Dominguez was that the body had

6   already been buried, to the statements to law enforcement, on

7   either April 11th or April 16th, and that statement that he

8   makes that the body had already been -- that he -- that's when

9   he discusses the statement, which I think is one of the next

10  ones, regarding Jazmerae Torrez having told them that the body

11  was buried by the river.  And so that was a statement that

12  Dominguez had told Task Force Officer Abeyta on April 11th,

13  2018.

14         And so this concealment and this misdirection is

15  still part of their plan to -- to kind of conceal and -- their

16  actions and what they had done, and so that that's -- so that

17  by her pretending like she's still alive, pretending like she's

18  going to message her and that she would get back to Detective

19  Marez are all sort of misdirection statements.

20         Kind of as a secondary argument, Your Honor, these

21  are also kind of nonhearsay statements, so that they could come

22  in under another theory as well.  Because none of these

23  statements would be offered for the truth, because there's no

24  way that she could make these statements to Ms. Mora at this

25  point.  These are all lies that she's perpetrating, and so

1    that -- so it did -- so other -- in addition to the

2    co-conspiracy, they could come in as nonhearsay statements

3    because they are lies and misdirection generally, and so they

4    could be offered in a second context that would allow the

5    United States to offer these statements, since they are

6    nonhearsay statements, so that they -- they would be -- they

7    wouldn't be subject to the -- to the hearsay rule.

8          So, Your Honor, from both of -- for those reasons,

9    the United States would argue that we should be able to offer

10   these as co-conspirator statements as part of the concealment

11   or as nonhearsay statements, since they are lies and

12   misdirection, that they wouldn't be offered for the truth of

13   the matter asserted in those statements.

14         And I think that's it for those two statements.

15   Thank you, Your Honor.

16         THE COURT:  All right.  I will find that you have met

17   your burden to show that they were non-testimonial and

18   noncustodial and that the Sixth Amendment issue is not

19   applicable here as to these statements for Ms. Ramos, Crystal

20   Ramos.  Also, in furtherance of the conspiracy, based on the

21   testimony that I have I heard this morning, I am going to find

22   that you have met your burden that these statements by

23   Ms. Ramos were in furtherance of the conspiracy.  So the

24   objection is overruled by the defense.

25         That will take us to, I believe, Jorge Dominguez on

1   page 4 of document 190.

2            If you would like to begin, Mr. Villa.

3            MR. VILLA:  Yes, Judge.  Thank you.

4            So the first one is B1, which is Jazmerae Torrez

5   describing where they finally disposed of the remains.  This

6   appears to be a statement that she makes to Jorge Dominguez

7   after the fact.  The answer is was it -- "It was there in the

8   backyard.  It's not there no more.  But to me, Jazz told me

9   that -- that they buried it somewhere by the river, that it's

10  really easy to find."  So this is Dominguez describing what

11  Jazmine Torrez told her -- told him after they had already

12  buried the body, so the conspiracy ended and Jazmine Torrez's

13  description of where they buried the body is after the fact and

14  not in furtherance or during -- or in the scope of the

15  conspiracy.

16           The next one for Mr. Dominguez is number 5, on

17  page 7.

18           THE COURT:  All right.

19           MR. VILLA:  So a lot of what's cut out in this part

20  is -- talks about the plan, which we've already agreed that the

21  plan and that sort of stuff is admissible, but I think what 5

22  primarily is concerned with is Boo Boo -- that is allegedly

23  Mr. Lopez -- saying that she took her last breath.  So I think

24  that's after the fact, although I think if Mr. Dominguez can

25  testify in court that he heard Mr. Lopez say that, it's a party

```
 1   admission, it's not really a co-conspirator statement.  But if
 2   the United States wanted to pursue the co-conspirator theory,
 3   we would argue that that was not in furtherance of the plan to
 4   kidnap, torture, murder, or dispose of the body.
 5            The next part is on page 8, the third paragraph.  I
 6   think the rest of this that's in here is just descriptions of
 7   what happened and what they saw.  But the third paragraph, it
 8   says, "DOMINGUEZ woke up, [and] Boo-Boo told him everything had
 9   been taken care of, but BLACK said they still had to take care
10   of the body."
11            A little later down:  "He was awoken by BLACK and
12   RAMOS telling him and ROMERO they all needed to leave the house
13   right away to dispose of MORA's body."
14            And so I think those were the ones that really needed
15   the Court's ruling on the conspiracy.
16            THE COURT:  Right.
17            MR. VILLA:  I think the Court having ruled the way it
18   did on the conspiracy, that's one that we would agree to.
19            THE COURT:  All right.  Specifically which parts are
20   you objecting to, just so I'm clear?
21            MR. VILLA:  So that page 8, paragraph 3, we aren't
22   objecting anymore.  We're withdrawing that one --
23            THE COURT:  Okay.
24            MR. VILLA:  -- based on the Court's ruling of when
25   the conspiracy ended.
```

```
1              THE COURT:  But the rest of it, you are objecting to?
2              MR. VILLA:  Well, the rest of it, I don't think the
3    Government is pursuing, because it's just narrative
4    descriptions of what happened.  Mr. Marshall can correct me if
5    I'm wrong.  I think those are the two items I identified under
6    5, where Boo Boo's saying she took her last breath, and then on
7    page 8, that third paragraph, I think that's all that's in
8    dispute with respect to number 5.
9              THE COURT:  All right.  Thank you.
10             MR. VILLA:  And, Judge, I may have done a poor job
11   writing my notes, but for number 6, I think that we agreed to
12   that one earlier, but I wrote down argue, and I may have just
13   wrote down the wrong word.
14             THE COURT:  I didn't mark that as one that you agreed
15   to.
16             MR. VILLA:  Okay.  Because it appears like what
17   Mr. Jorge Dominguez is saying, is Ms. Ramos was planning --
18   what she was planning to do with Ms. Mora, the torture part of
19   it, and consistent with our other agreements, I think we agree
20   to that one as being a co-conspirator statement.
21             THE COURT:  All right.  So you're agreeing to 6?
22             MR. VILLA:  Correct.
23             THE COURT:  Thank you.
24             MR. VILLA:  So what's really an issue, I think, for
25   Mr. Dominguez is that small, little part at 5 if the Government
```

1    wants to prove -- pursue the co-conspirator theory, and then 1.

2         THE COURT:  All right.  Thank you.

3         MR. MARSHALL:  May I argue from counsel table?  Is

4    that okay for this one?  I've kind of spread out.

5         THE COURT:  That's fine.

6         MR. MARSHALL:  I apologize.

7         Now, for the -- for what's kind of characterized as

8    B1, the statement between Jazmerae Torrez and Jorge Dominguez,

9    under, kind of like, again, the theory of the end of when the

10   conspiracy happened as well as from the Alcorta case, of

11   keeping abreast of activities, this is Jazmerae Torrez's

12   statement to Mr. Dominguez that the conspiracy is now over,

13   essentially.  It is announcing the final, kind of, part of the

14   conspiracy, because this is when Ms. Torrez -- and it tells

15   Mr. Dominguez that the body is now buried, and so she's telling

16   him that it's -- essentially that it's over with, and so that

17   it was the final act.

18        But at that point Mr. Dominguez wouldn't have known

19   that it was over, because the body hadn't been buried at that

20   point and the conspiracy would have been ongoing.  So this is,

21   effectively, one of the final acts, if not the final act, of

22   the conspiracy, is her telling the other co-conspirator that

23   it's done, it's over, and then -- and so she's announcing the

24   end of the conspiracy.  And so by -- by -- under the theory

25   under Alcorta and keeping abreast of activities, by marking the

1    end of the conspiracy, that statement should be allowed in.

2            Now, for statement 5, the first paragraph that

3    originally I thought that defense was going to argue, but that

4    was going towards the plan from -- between Ms. -- but I'm not

5    sure if they agreed to that now, but that Crystal Ramos had

6    wanted to lure her back and everything, but I think those

7    statements by Ms. Ramos are all part of the planning phase and

8    then, therefore, would come in.

9            I think, if I'm understanding Mr. Villa's argument

10   correctly, the concern is that the statement by Mr. Lopez that

11   he appeared and said in Spanish to the effect that Ms. Mora had

12   taken her last breath.

13           THE COURT:  And where -- And that is in paragraph?

14           MR. MARSHALL:  Page 7, the last paragraph, last full

15   sentence.

16           THE COURT:  All right.

17           MR. MARSHALL:  And, Your Honor, that is an act in

18   furtherance of the conspiracy and a further -- and so what was

19   going on, because at that point they had still been in the

20   midst of torturing Ms. Mora.  And so if Mr. Dominguez had

21   stepped out of the room for some reason and was no longer

22   participating in the -- kind of the beatings and torture of

23   Ms. Mora, this is the signaling of -- by Mr. Lopez signaling

24   that it's over, that the torture component has stopped because

25   Ms. Mora had finally passed away and that she had taken her

1    last breath.  So this is still a statement that would be done

2    in furtherance of the conspiracy.

3          Additionally, we also argue that this statement would

4    come in as a statement by a party opponent, and so it would

5    come in -- should come in under both theories or either theory,

6    that it could still come in -- that if Mr. Dominguez testifies,

7    that he could also say that, because that would be a statement

8    by a party opponent, that it was a statement by Mr. Lopez

9    during the time in question.  I mean, because this is -- this

10   is the time during the middle of the conspiracy or -- when they

11   were torturing -- torturing Ms. Mora.  And so it should come in

12   under both theories.

13         And then I believe that Mr. Villa was correct.  It's

14   the -- the problems, I think, that we had argued were for the

15   third paragraph on page 8, where the statements were -- the

16   remaining parts appear to mostly be narrative, that

17   Mr. Dominguez should be allowed to testify to should he

18   testify, because those are all things that he witnessed, and

19   now it appears that Mr. Villa and the defense is agreeing to

20   those statements coming in.

21         So I think for part 5 it is just the statement by

22   Mr. Lopez about taking her last breath or that she took her

23   last breath.

24         THE COURT:  Is that correct, Mr. Villa?

25         MR. VILLA:  Yes, Judge.  I want to clarify, when the

1   briefing was done, Mr. Dominguez was -- had not entered into

2   the agreement to testify, and so if he was not available as a

3   witness, I think the Court would have to make a lot of rulings.

4   Because Mr. Dominguez has agreed to testify, all of this

5   narrative information, he'll just testify about what he saw,

6   what he observed, so it is correct that -- what Mr. Marshall

7   said.

8            THE COURT:  All right.  Thank you.

9            As to -- I'm going to start with part 5 regarding

10  Mr. Dominguez.  I am going to find that the Government has met

11  their burden and that the statement about -- should be

12  admitted.  It talks about the current status of the conspiracy

13  and also admissible under Rule 801(d), party opponent

14  statements.

15           As to Jorge Dominguez part 1, I'm going to take that

16  under advisement and issue a ruling on that.

17           So that takes us to statements from Robert Abeyta, I

18  believe, starting at number 2 on page 11, if I'm not mistaken.

19           Mr. Villa.

20           MR. VILLA:  I think that we agree to paragraph 2,

21  again, just specifically the statements.  A lot of it is

22  narrative that we assume Mr. Abeyta will testify to.

23           But if my memory is clear, I think we agreed that

24  first box on page 11, where it says Ramos talked about eating

25  dinner around Mora's body, placed on the kitchen table, that

1    was part of her plan, so I think we agreed to that one as a
2    co-conspirator statement.
3              THE COURT:  All right.
4              MR. VILLA:  Black participated in the planning of
5    Mora's murder; was Black and Romero's idea to put the plastic
6    down.  I think the idea part, the planning, we've agreed to
7    that.
8              The rest of it is narrative.  Dominguez choked Mora,
9    Boo Boo and Black cut Mora's body, Jazmerae was surprised that
10   Black was not there when the murder occurred, I think those are
11   just narratives and not statements.
12             I think we agree to 3 and 4.
13             THE COURT:  Yes.
14             MR. VILLA:  With respect to number 5, we had not
15   agreed, but given the Court's ruling on when the conspiracy
16   ended, we agree with this one, that it was made in the course
17   of the conspiracy --
18             THE COURT:  All right.
19             MR. VILLA:  -- because they're talking about Ms. Mora
20   still being in the backyard in the box.
21             I think 6 was already agreed to.  So there may not be
22   anything left to argue with Mr. Abeyta, other than, I guess,
23   just the United States agreeing that the majority of this is
24   narrative and we're just focusing on the statements of the
25   plans.

1          THE COURT:  We're talking about under number 2 on

2    page 11?

3          MR. VILLA:  Correct.  I think the rest are really

4    just statements.  But I do believe Mr. Abeyta's going to

5    testify, so I don't think there's any issue with -- I don't

6    think we're going to have a witness coming in and repeating

7    what Mr. Abeyta said.  So as far as his narratives, he can just

8    testify to those.

9          THE COURT:  All right.  Anything from the United

10   States?

11         MR. MARSHALL:  We kind of agree that a large portion

12   of that is narrative and Mr. Abeyta would need to testify to

13   it.  But it -- it sounds like, at this point, defense is

14   agreeing with most of the other statements, so I think we're

15   fine with kind of that caveat, that Mr. Abeyta needs to testify

16   for the narrative portion.

17         THE COURT:  All right.  Thank you.

18         I think that takes us to statements from Jessica

19   Romero starting on -- Well, let's see.

20         MR. VILLA:  16.

21         THE COURT:  Yes.

22         MR. VILLA:  So, yes, with respect to Ms. Romero, we

23   previously agreed on D2, that first paragraph.  I guess for a

24   clean record, I would want the Government to agree to the rest

25   of those paragraphs, 2, 3, 4, and 5, on page 16 are just

1  narrative and Ms. Romero, we anticipate her testifying about

2  these things.

3         I think what's at issue for the Court now on page 17

4  is that -- The first box I think is just narrative.  The

5  Government can correct me if I'm wrong.  The second box on

6  page 17 is:  "That they yelled at Mora while assaulting her,

7  yelling, 'You took my money, how could you sit at our table.'"

8         So we would argue that those are not statements in

9  furtherance of the conspiracy or course and scope.  It sounds

10  just like Ms. Ramos or others taking out their anger on

11  Ms. Mora while she's being attacked or assaulted.

12         And then the second statement in that box is:  "RAMOS

13  complained that she wanted MORA to 'suffer' and was upset that

14  'she was gone too easy.'"

15         So we interpret this, Your Honor, as Ramos commenting

16  after the fact, after Ms. Mora died, that Ms. Mora didn't

17  suffer enough and she was gone too easy.  So that's not in

18  furtherance of the kidnapping or murder, conspiracy, and it's

19  not in furtherance of any conspiracy to dispose of the remains.

20  It's simply a comment by Ms. Ramos that would be inadmissible

21  hearsay.

22         The third box I think is just narrative and not at

23  issue.

24         The fourth box is:  "RAMOS said they had to get rid

25  of the body quick so they, 'lit it.'"  This is written in the

1    past tense.  "RAMOS said they had to get rid of the body ... so

2    they 'lit it'"  "Lit," past tense.  And again, this is

3    Ms. Romero conveying what Ms. Ramos told her that's after the

4    fact.  It's much like the one you took under advisement for

5    Ms. -- that Ms. Jazmerae Torrez made to Jorge Dominguez.  And

6    so I think the same argument applies.  It's just a comment made

7    after the fact.

8            3 and 4 for Ms. Romero are withdrawn.

9            We agreed on 5.

10           And then with respect to 6, 6 is, again, a statement

11   from Ms. Romero about what Ms. Ramos told her.  So if you look

12   at line 6 there, it's "Crystal briefly told me that she

13   strangled Jessica," and she goes on to describe, essentially,

14   what Ramos told her, so this is also after-the-fact

15   descriptions by Ramos to Romero, and, therefore, inadmissible

16   hearsay.

17           6 was withdrawn, and 7 we agreed to.  So I think that

18   covers all of Ms. Romero.

19           THE COURT:  All right.  Thank you.

20           Mr. Marshall.  We're talking about number 2 and

21   number 6.

22           MR. MARSHALL:  Yes, Your Honor.  Starting on D2, the

23   first part was agreed upon, so I believe we're looking at two

24   statements that were on page 17.  The first of those

25   statements -- or the boxes that I think actually contains two

1    statements, so it would be three statements.  But it's the

2    second box.  And, Your Honor, again, I think this is still part

3    of the conspiracy.  It's describing their intent and why they

4    were doing what they were doing, that "You took money, how

5    could you sit at our table" for the description of what was

6    being yelled at to Mora.

7            Additionally, these statements could come in as

8    excited utterances, and so they would be nonhearsay statements

9    for that reason, that they would be -- because these are

10   yelling, kind of declarations, that they were being made, that

11   they would come in -- they could come in under that theory as

12   well.  But they are also -- They're just -- They're still

13   continuing to describe what was going on as part of their

14   conspiracy.  Their conspiracy began because Ms. Mora had stolen

15   the money from them, and this is them acting it out, and so

16   this is still in the middle and in furtherance of the

17   conspiracy as a description of what was going on while they

18   were in the midst of assaulting and torturing her.

19           The next part was that Ramos complained that she

20   wanted her to suffer and was upset that she was gone too easy.

21   Again, that was still in the middle of the conspiracy and

22   describes the actual conspiracy, that their plan had been to

23   torture Ms. Mora for an extended period of time.  They had

24   wanted her to suffer in a way that was kind of painful, and --

25   and then Ramos was seeking her vengeance for what had -- what

1    had been done, and that she was gone to too easy was -- that

2    this was kind of a break from what their plan had been.  It's a

3    description that their plan had gone -- had meant to go further

4    in the amount that they were going to torture Ms. Mora, and so

5    that was still in the middle of and in furtherance of the

6    conspiracy.

7            The fourth box down, that "Ramos said they had to get

8    rid of the body quick so they, 'lit it.'"  And I think it

9    depends on how you look at that -- The statement itself could

10   be that Ramos said they had to get rid of the body quick,

11   meaning they still had the body at the time, and then -- and

12   then Ms. Romero was describing their actions so that they then

13   went and they lit it.  This statement is still, again, in

14   furtherance of the conspiracy as it was a description of what

15   was going on at the time.

16           Jessica Romero was only living in that house

17   during -- while this conspiracy was going on, and so any

18   statements from Ms. Ramos to Jessica Romero would have been

19   made still during the time period of the conspiracy and so it

20   would have been made in furtherance of the conspiracy.

21           Should the Court have any questions about this one, I

22   would ask that the Court hold it in abeyance and perhaps let

23   the United States lay some groundwork with Ms. Romero about the

24   time frame about what -- what would have been said.  She was

25   the one that would be able to describe when the statement was

1    coming from Ms. Ramos, if there are concerns about that.

2              But her time period when she was still living in the

3    house was while the conspiracy was ongoing before the body

4    was -- before the body -- while the body was still in the

5    toolbox at house, and so the conspiracy was ongoing, and so I

6    would ask that this be allowed in as a statement in furtherance

7    of the conspiracy.

8              And --

9              THE COURT:  Let me ask you.  Mr. Villa indicated that

10   he felt like the rest was narrative.  Do you agree with that?

11   And are you expecting Ms. Romero to testify?

12             MR. MARSHALL:  Yes.  For the other boxes, it does --

13   the -- it does appear to be narrative statements.  Other than

14   the statement by Ms. Mora saying that that's enough.  But

15   again, I think that would come in as an excited utterance

16   should Ms. Romero testify, and so that those would all be

17   statements and descriptions that she's making as an eyewitness,

18   or earwitness, depending on whether she was still in the room

19   or she was out of the room.  But -- And so she would be able to

20   describe her observations to things that she heard at the time.

21   So I agree with that.

22             THE COURT:  All right.

23             MR. MARSHALL:  And I think that there was -- Was

24   there still argument on number 6 or ...

25             THE COURT:  Yes.

85

1          MR. MARSHALL:  Okay.  And again, it's similar

2    statements.  I think these statements from Ms. Romero came in

3    two different points, but I think this is similar to part of

4    the argument about how they wanted to torture her, that she

5    died too fast.  These are all kind of descriptions that

6    Ms. Ramos makes to Ms. Romero during the conspiracy.  She's

7    describing what she had done and what they -- and that things

8    had happened quicker than Ms. Ramos had wanted, because her

9    goal had been to torture her for an extended period of time,

10   and so it was contrary to her plan.

11          And as you look -- As part of this description, this

12   is shortly after -- it seems to have appeared shortly after

13   they had killed her but before -- while the body was still

14   wrapped up before they had even taken the body to be burned,

15   and so that there -- this is still in the midst of the

16   conspiracy.  Ms. Romero is still part of the group that goes to

17   the burn site, and so that there -- This is also a part of the

18   conspiracy and in furtherance of the conspiracy about what they

19   need to do and what needs to happen.  And so that statement

20   should come in for -- as part of -- as a co-conspirator

21   statement in furtherance of the conspiracy.

22          THE COURT:  All right.  As to Jessica Romero's

23   statements in issue, I will take those under advisement and

24   issue a ruling, and we're talking about number 2 and number 6,

25   as defined.

1          So I think that takes us to statements -- that takes

2   us to Facebook, does it not, Mr. Villa?

3          MR. VILLA:  That's correct, Your Honor, just the

4   March time frame.

5          THE COURT:  All right.

6          MR. VILLA:  As we previously agreed, we don't object

7   to the January time frame.  The March time frame, Judge, is on

8   page 22 at the top.  That long message is actually from a March

9   time frame that the date was cut off.  And then you have to

10  skip over to page 24 where March picks up again.

11         And I think what the Government will argue is these

12  are statements that Crystal Torrez, that being Crystal Ramos,

13  was making to Jessica Mora to sort of make it look like she

14  thought she was still alive or -- or what have you.  But the

15  statements themselves aren't in furtherance of a conspiracy or

16  co-conspirator statements.

17         She's essentially talking about how she's angry at

18  her, and in one of them talking about wanting to fight her, go

19  to war with her.  I would submit, those are not co-conspirator

20  statements or in furtherance of the conspiracy.

21         It's also not clear when the body was buried with

22  respect to this time frame.  This is much closer to Mr. Black's

23  general estimate of three months, because now we're at the end

24  of March, and so I don't think there's sufficient evidence for

25  the Court to determine that they were during the course of the

1    conspiracy.

2            THE COURT:  All right.  Thank you.

3            Mr. Marshall.

4            MR. MARSHALL:  Yes, Your Honor.  We argue that these

5    are part of the conspiracy, that these are still part of the

6    misdirection that Ms. Ramos was employing to try to make it

7    appear that she was not -- she did not have anything to do with

8    the murder, when, in fact, she was the primary organizer of it

9    all, and so that this is sort of the misdirection that is done

10   in furtherance of the conspiracy.  As kind of a secondary

11   argument, other than the misdirection argument that we've kind

12   of dealt with earlier because it's a very similar argument to

13   the argument -- the statements that were made to Detective

14   Marez, the -- some of these statements would also come in as

15   nonhearsay statements.  These are not -- These statements would

16   not be offered for the truth of the matter asserted.  These

17   are -- So that these -- many of the March statements that we're

18   referring to would be just -- they are, again, misdirection

19   statements, and so they could be offered by the United States

20   for other nonhearsay purposes that -- because they're not

21   offered for the truth.  They're -- Again, there's sort of that

22   misdirection component and the lies that Ms. Ramos was -- was

23   making and putting out into the world about that misdirection

24   towards -- towards whether or not Ms. Mora was still alive at

25   that point, when, in fact, she had been dead for a little over

1   two months at that point.

2              THE COURT:  All right.  Thank you.

3              I'm also going to take the Facebook under advisement.

4              I think that's everything.  Is it not, counsel?

5              MR. MARSHALL:  I believe so, Your Honor.

6              MR. VILLA:  I believe that is, Judge.

7              THE COURT:  All right.  The Court will take these

8   under advisement and issue a ruling forthwith.

9              Anything else we need to take up today?

10             On behalf of the United States?  Sorry.

11             MR. VILLA:  No, Your Honor.

12             THE COURT:  On behalf of defense?

13             MR. MARSHALL:  No, Your Honor.  There -- We do have a

14  Lafler/Frye motion and we would like a hearing but --

15             THE COURT REPORTER:  I'm sorry, I couldn't understand

16  you.

17             MR. MARSHALL:  I'm sorry.

18             We have filed a Lafler/Frye motion, and defense has

19  also agreed that we should have a hearing on it, but we -- we

20  would just ask that if we could have that closer to our trial

21  date, so it's not something that we want imminently, but

22  something, perhaps, in April or May, to have that -- to have

23  that hearing.

24             THE COURT:  I usually do that at the pretrial

25  conference.  Would you like it before the pretrial conference?

```
 1              MR. MARSHALL:  That's fine with me.  I don't know if
 2    defense would prefer to have it sooner than that or not, but
 3    it's -- I believe the Court usually has a pretrial conference
 4    about a week or two before the trial.  Is that correct?
 5              MR. VILLA:  Your Honor, I kind of was trying to
 6    remember if we have a plea deadline in our scheduling order and
 7    where that is in relationship to the pretrial conference.  I
 8    know it's been submitted by email to Your Honor.
 9              THE COURT:  June 9th.
10              MR. VILLA:  Yeah.  So it seems to make sense to do it
11    after that --
12              THE COURT:  All right.
13              MR. VILLA:  -- in case there's any further plea
14    negotiations.  I know some courts like to have us do that with
15    a magistrate, but we'd be happy to do it with Your Honor at the
16    pretrial, if you want.
17              THE COURT:  I don't mind if you do it with the
18    magistrate.  I also don't mind doing it at the pretrial.
19    Whatever is easier for you.  It looks like we have a pretrial
20    conference on June 12th, so that's three days after the
21    deadline passes.
22              MR. VILLA:  That makes the most sense to me, to do it
23    after the deadline.
24              THE COURT:  We can just do it at the pretrial
25    conference.
```

1          MR. MARSHALL:  The only other thing was that we just

2    wanted to notify the Court, the parties were going to work on

3    narrowing down the witness list.  The witness list -- I'm sure

4    the Court saw the list.  I believe there's almost a hundred --

5    over 150 witnesses.  We were going to work on narrowing it down

6    because we would -- our plan is to try and make it less than

7    the two-week trial that we have proposed, or the nine days that

8    we have proposed.  So we are working on that goal, and we

9    will -- once that's done, we'll offer an amended list for the

10   Court.

11         THE COURT:  All right.  Thank you.  And I do

12   appreciate counsel working together very much, and your working

13   together today, and we will get you a decision in this matter.

14         Anything else, Carol?

15   (A discussion was held between the Court and Ms. Bevel.)

16         THE COURT:  She made a good point.  I have started in

17   my longer cases, and I'm sure you-all have seen, requiring that

18   counsel confer and come up with a detailed trial schedule, and

19   that has caused some confusion and great concern for the

20   parties, and that's not why I'm trying to do it.  I think it

21   has proven, in the cases I've done it, very beneficial to both

22   sides.  I do want a very detailed -- We can send you an

23   example --

24         Did we put one in our new --

25         MS. BEVEL:  Not yet, Your Honor --

1          THE COURT:  Okay.

2          MS. BEVEL:  -- but I can send them an example.

3          THE COURT:  -- a timeline through the day.  And we

4    may want to talk about it a little closer to trial, but we

5    have -- The Court takes a -- We usually start at 8:30 or 9:00

6    depending on how much we're trying to pack in.  We usually take

7    a midmorning break of 15 minutes; lunch an hour; and an

8    afternoon hour break of an hour -- excuse me, an afternoon

9    break of 15 minutes.

10          And so I like the day broken up by witnesses, who's

11   going to testify, how long the United States is going to take,

12   how long cross-examination is going to take, so direct, cross,

13   and redirect is built into the direct.  As far as I'm

14   concerned, that's fine.  We've kind of figured out that unless

15   we're going past 5:00 -- and I want don't like to go real late

16   unless we're trying to get it in, and I will if I have to, we

17   usually are done by 5:30 on the day.  Normally, it's about six

18   hours of testimony a day, is what we're getting in, and that's

19   pushing it hard.

20          So if you have any questions about that, it's not

21   intended to stress you out, reach out.  We can show you what

22   we've received, and we're getting ready to put it in our

23   pretrial information that we send out.  So if you'd start

24   thinking about that.

25          But I'm not trying to be difficult, but it really has

```
1   been helpful for everyone involved, so ...
2              MS. GORMAN:  Your Honor, we have that in our
3   scheduling order for January 9th.  Is that an appropriate date
4   to get it to the Court?
5              THE COURT:  Absolutely.
6              All right.  If there's nothing else, thank you.  Have
7   a good lunch.  We'll be in recess.
8              MR. VILLA:  Thank you, Judge.
9       (Court stood in recess at 11:59 a.m.)
10  * * * * * * * * * * * * * * * * * * * * * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                         I N D E X

2    EXAMINATION                                        PAGE

3    GOVERNMENT'S WITNESS MICHELLE COBB

4         Direct Examination by Mr. Marshall             5
          Cross-Examination by Mr. Villa                24
5         Further Cross-Examination by Mr. Villa        49
          Redirect Examination by Mr. Marshall          50
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C-E-R-T-I-F-I-C-A-T-E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4            I, Danna Schutte Everett, RPR, NM CCR, CRR,

5    and Official Court Reporter for the United States

6    District Court, do HEREBY CERTIFY that I did report

7    in stenographic shorthand to the best of my skill and

8    ability the foregoing pages of the proceedings set

9    forth herein, and that the foregoing pages constitute

10   a true transcript of the proceedings had before the

11   said Court held in the City of Albuquerque, County of

12   Bernalillo, New Mexico, in the matter therein stated.

13

14           In testimony whereof, I have hereunto set

15   my hand on this 29th day of March 2023.

16

17                    _____
                      DANNA SCHUTTE EVERETT
18                    Official Federal Court Reporter
                      Registered Professional Reporter
19                    Registered Merit Reporter
                      Certified Realtime Reporter
20                    NM Certified Court Reporter #139
                      100 Church Street
21                    Las Cruces, New Mexico  88001
                      Phone:  (575) 528-1656
22                    Fax:  (575) 528-1645
                      dannadawn@comcast.net
23
     January 17, 2023, USA vs. Mariscal-Lopez
24

25
```