IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    Cause No. 1:21-cr-00524-MLG

LUIS MARISCAL-LOPEZ,

        Defendant.

## MR. LUIS MARISCAL-LOPEZ'S SENTENCING MEMORANDUM

Defendant, Luis Mariscal-Lopez, by counsel, The Law Office of Ryan J. Villa, by Ryan J. Villa, and Sarah M. Gorman, submits the following Sentencing Memorandum in support of the agreed upon sentence of 17 years of imprisonment pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Given all of the facts and circumstances of this case, this sentence t is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  As explained below, a sentence of 17 years' incarceration followed by a term of supervised release is sufficient to accomplish the statutory purposes of sentencing. This proposed sentence reflects the nature and circumstances of the offense, in which Luis was not the planner or most culpable participant, and Luis's personal history and characteristics. It takes into account that this period of incarceration will follow his state sentence for which he has been incarcerated in state custody since January 3, 2019. He will not complete that sentence until March 2027. It also takes into account Luis's upbringing and childhood in which he lost both his parents in car accident when he was just 12 years old. This sentence will be consistent with the principle that the Court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 181, 113 (1996).

# BACKGROUND

## I.   Luis's childhood, upbringing and personal circumstances.

At the time of sentencing, Luis will be 26 years old. He was born in Santa Rosa, California but grew up in Los Mochis, Sinoloa, Mexico. PSR, ¶ 67.Life was difficult in Mexico where his family struggled, experiencing poverty and violence. Tragically, when Luis was just 12 years old both of his parents were killed in a car accident. PSR, ¶ 68. While Luis had his older sister and grandma to take him in, he was mostly left to fend for himself. At 14, he dropped out of school so he could work with his uncles doing construction to support himself and his family financially. PSR, ¶ 69. Because he is a U.S. citizen, at 18, Luis decided to travel to Espanola, New Mexico with a friend to try and make a better life for himself and his family. PSR, ¶¶ 69-70. Luis struggled for his first two years in Espanola and then unfortunately, he fell into trouble starting in 2018 and was arrested in February 13, 2019 on the state charges for which he is now serving a 7-year sentence. PSR, ¶ 56. He has been incarcerated since February 13, 2019.

As discussed, the 17-year sentence in this case will not begin until he completes this sentence, which is expected to be completed in March of 2027. PSR at pp. 1-2 (Release Statuts). Because he is serving a state sentence, but was brought into federal custody pending the charges in this case on a Writ of Habeas Corpus Ad Prosequendum, *see* Doc. 29, he was not able to receive any good-time credit on the state sentence. This is because in federal custody he cannot do programming that is available in state custody which could reduce his 7-year sentence. Luis was brought into federal custody on this Writ on August 9, 2021. *See* Arrest Warrant Returned Executed [Doc. 39]. Thus, for the last two and a half years, he has served straight time in state

custody and not received any time off for good behavior. After sentencing in this case, he should be returned to state custody to complete his sentence, after which he can commence serving the instant sentence

## II.    The present offense and procedural history.

As the PSR and factual basis in Luis's plea make clear, Luis was not the primary instigator or planner of the events that ultimately led to the victim's death. The victim had been living with and romantically involved with the homeowner of McKracken, where the murder occurred. The victim had stolen the homeowner's ATM card and withdrew money from her account. In retaliation, the homeowner had others, not Luis, bring her from a casino to her home. As Luis admitted, he did participate in beating the victim which ultimately led to her death. From Luis's perspective, he never intended that the victim be killed, but when she did die, he admitted that he participated in disposing of her body.

As the Court heard when it accepted Luis's Plea Agreement and the specific sentence of 17 years, the evidence against Luis was not strong. The government's case relied on the testimony of witnesses who also participated in the killing or were otherwise compromised in that they had previously lied about the events and/or had drug addiction issues. Ultimately, rather than force the government and the victim's family to go through a long, difficult trial, Luis agreed to accept responsibility for his role in the crime in exchange for the 17-year sentence.

Critically, Luis was only 19 years old at the time of the crime, before his brain had fully matured. Brain structure, function, and connectivity continue to mature throughout our early

twenties.[1, 2] This period of ongoing brain development has profound effects on decision-making, self-control, and emotional processing.[3] When adults make decisions, the brain relies on the rational prefrontal cortex, responsible for controlling impulses and emotions and forming judgments.[4] On the other hand, decision-making for teenagers occurs in the amygdala, which is located further back in the brain and is considered the center of emotions, emotional behaviors, and motivation.[5] As the human brain matures, connections are formed between the rational prefrontal cortex and other parts of the brain that facilitate self-control, emotional regulation, and more complex decision-making.[6] The formation of these connections is only starting to occur during adolescence, which makes "adolescents susceptible to emotionally driven decisions, impulsive behavior, and poor judgment."[7]

---

[1] *See* Center for Law, Brain & Behavior at Massachusetts General Hospital (2022). *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers* at 2. Available at https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/. Last accessed 03/21/23.

[2] *See* SciShow: *The Teenage Brain Explained* (03/12/14) online at www.youtube.com/watch?v=hiduiTq1ei8. Last accessed 03/21/23. (Ten-minute video by Hank Green discussing the science of adolescent brain development).

[3] *Supra* note 4.

[4] *Supra* note 4; *see infra* Fig. 1.

[5] *Id.*; *see also* Mariana Gongora et al., Neuropsychiatry London (2019). *Neurobiological Evidences, Functional and Emotional Aspects Associated with the Amygdala: From "What is it?" to "What's to be done?"* at 2379. Available at www.jneuropsychiatry.org/peer-review/neurobiological-evidences-functional-and-emotional-aspects-associated-with-the-amygdala-from-what-is-it-to-whats-to-be-d.pdf . Last accessed 03/21/23.

[6] *Supra* note 4 at 12-13.

[7] *Id.* at 13.



Fig. 1 The limbic system
https://qbi.uq.edu.au/brain/brain-anatomy/limbic-system

The part of the brain used to interpret the world differs between adults and adolescents. As in the case of decision-making, adults use the prefrontal cortex, while adolescents use the amygdala, which causes them to react quickly from the emotional part of the brain and misread situations and expressions.[8] "Development of the prefrontal cortex can also influence how" adolescents respond to potential threats; faced with an acute threat, they respond more impulsively than adults, and this "enhanced impulsivity" results in even less use of the rational prefrontal cortex.[9]

During adolescence, decision-making, impulse control, and risk-taking behaviors are more powerfully influenced by peer involvement than in adulthood.[10] "[A]dolescents are more likely to

---

[8] *Supra* note 5 at 6:22-7:22.

[9] *Supra* note 4 at 30.

[10] *Id*. at 24.

take risks in the presence of peers than when they are alone," which "is why many crimes committed by adolescents involve peers."[11] It is fun to be around friends, and research has found that the presence of a peer "enhances responses in a brain region that is important for motivation and reward processing (striatum)."[12] When involved in risk-taking behaviors, adolescent brains showed more activity in the reward processing area of the brain if peers were present than when they were alone.[13] Consequently, this "boost in brain activity was related to increased risk-taking behavior."[14] As the brain develops and eventually matures in adulthood, the presence of a peer begins to lose influence over decision-making, impulse control, and risk-taking behaviors.[15]

The need to arrive at a fair and scientifically informed sentence for adolescent offenders is so important that the issue has made its way to the United States Supreme Court on multiple occasions. In *Roper*, *Graham*, and *Miller*, discussed in greater detail below, the United States Supreme Court recognized that the frequency of criminal offending tapers off in early adulthood. In other words, as the brain matures, so does the person. One criminal trajectory study found that "most individuals who committed serious crimes at 17 and 18 (including armed robbery and felony assault) did not continue to engage in antisocial behavior into adulthood, following court involvement."[16] This is consistent with studies showing that "[v]iolent crime peaks at ages 17-19 and decreases in the early twenties."[17] In fact, a robust body of research indicates that committing

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 38; *see also* **Ex. 1**, Evaluation at 17.

[17] *Id.*

a violent crime before age twenty is not a strong predictor of a persistent criminal trajectory. While there are no research studies involving solely late adolescents, research indicates that early and middle adolescents who commit homicides have similar rates of desistance from misconduct to youth who commit other kinds of less serious offenses, and committing a homicide in adolescence is not itself a predictor of either future violent or non-violent recidivism.[18]

This research confirms with data what we know to be true through experience – adults are not carbon copies of their adolescent selves. Instead, as the human brain develops to make rational decisions, impulsivity and risk-taking behaviors decline. And as impulsivity and risk-taking go down, so does the likelihood of criminal offending. In other words, "the propensity for impulsive acts or irresponsibility in adolescence is a mode of behavior that can be outgrown." [19] Treatment rather than a long prison sentence reduces recidivism rates for young offenders.

Many factors that make adolescents vulnerable to risk-taking behaviors, such as sensitivity to rewards, also create opportunities for prosocial learning and adaptation.[20] "Relative to children and early-middle adolescents, late adolescents ages 18-21 are more likely to update and refine their decision-making strategies" as their brains get closer to maturity.[21] Additionally, "neuroscience and behavioral research indicate that late adolescents are particularly well suited to learning from experience given the right circumstances and contexts."[22] As a result, the late adolescent brain presents a window of opportunity for rehabilitation and prosocial learning. This is true for Luis,

---

[18] *Id.*

[19] Beatriz Luna, Hastings Law J. (2012). *The Relevance of Immaturities in the Juvenile Brain to Culpability and Rehabilitation.* at 9. Available at www.ncbi.nlm.nih.gov/pmc/articles/PMC5662008/. Last accessed 03/21/23.

[20] *Supra* note 4 at 36.

[21] *Id.*

[22] *Id.* at 37.

whose brain development in late adolescence is uniquely primed to learn from this tragic experience and to continue to modify his behavior to contribute positively to society. Given Luis's age at the time of the crime, 19, and his age upon release, approximately 45, recidivism is unlikely. This is because the behavior that brought him before the Court was limited to his adolescence and because individuals convicted of murder are "less likely to commit any other violent offense than" individuals initially convicted of nonhomicide-related offenses.[23]

## SENTENCING ANALYSIS

Luis does not object to, and agrees with, probation's calculation of his advisory guideline sentence. He agrees that his base offense level is 43, and total offense level 42. PSR, ¶¶ 42, 51. He also agrees that he is in criminal history category IV, and his guideline imprisonment range is 360 months to life. *Id.* ¶¶ 58, 81. However, given all of the circumstances and the parties' agreement, which the Court has accepted, the Court should find that a sentence of 360 months to life is greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Instead, the agreed upon sentence of 17 years is the appropriate disposition in this case. This is based on all of the factors identified above and provided to the Court at the plea hearing.

**I.   The Court should vary downward from the PSR's advisory guideline range because its application produces a sentence that is greater than necessary to accomplish the goals of sentencing.**

It is well-established that the Guidelines are no longer mandatory, but that as "a matter of administration and to ensure consistency, a district court should begin all sentencing proceedings by calculating the applicable Guidelines range." *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249, 1251 (D.N.M. 2017), citing *Gall v. United States*, 552 U.S. 38, 49 (2007). The initial calculation "serve[s] as a starting point and initial benchmark" for the district court in crafting a

---

[23] Ashley Nellis et al., The Sentencing Project (2021). *A New Lease on Life* at 12. Available at www.sentencingproject.org/app/uploads/2022/08/A-New-Lease-on-Life.pdf. Last accessed 3/22/23.

sentence. *Ibarra-Sandoval*, 265 F.Supp.3d at 1251. After due consideration of the Guidelines, however, the court is "free to make its own reasonable application of the § 3553(a) factors" and reject the advisory Guideline range. *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). The court should not presume the Guidelines are reasonable and "must independently consider all the sentencing factors in 18 U.S.C. 3553(a) to determine the appropriate sentence." *Ibarra-Sandoval*, 265 F.Supp.3d at 1251 (internal authorities omitted).

In cases where the "district court finds the § 3553(a) factors support an outside-Guidelines sentence," the court may vary from the advisory guideline range. *Id*. The district courts are now invited to consider arguments that the guideline itself fails properly to reflect § 3553(a)'s considerations, do not treat defendant characteristics properly, or that a different sentence is appropriate regardless of the advisory Guideline range. *Rita v. United States*, 551 U.S. 338, 351 (2007).

Section 3553 requires that the district court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a). Those purposes are:

> (2) the need for the sentence imposed –
>     (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense;
>     (B)  to afford adequate deterrence to criminal conduct;
>     (C)  to protect the public from further crimes of the defendant; and
>     (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). In selecting a sentence that complies with the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing," *Kimbrough*, 552 U.S. at 89, the judge "shall consider" the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the purposes of sentencing, § 3553(a)(2); the kinds of sentences available by statute, § 3553(a)(3); the kinds of sentence and sentencing range recommended by the Guidelines and any pertinent

policy statement issued by the Sentencing Commission, § 3553(a)(4) & (5); the need to avoid

unwarranted disparities, § 3553(a)(6); and the need to provide victim restitution, § 3553(a)(7).

**a. A sentence below the advisory guideline range adequately reflects the seriousness of the offense, Luis's role in the offense, promotes respect for the law, provides a just punishment, and takes into account Luis's history and characteristics.**

Luis respectfully requests that the Court vary from the advisory guideline range and

sentence him to 17 years of imprisonment.  By the end of this sentence, Luis will have served 24

years in custody. Luis has accepted responsibility for his actions by pleading guilty and while his

crime is a serious one, he was not the planner or the cause of the crime. The crime was planned

and carried out by the McKraken homeowner, who is now deceased, and carried out by a group of

individuals. While Luis should not have agreed to participate, he was not the ring leader, and the

crime would have still occurred even if Luis was not there. Thus, his culpability is less than the

others involved.

**b. Luis's young age at the time of the crime and the loss of his parents at 12 years old, supports a downward variance.**

Luis was just 19 years old when the crime occurred. As the science and studies discussed

above make clear, this means his brain was not fully developed, he was not operating as an adult

would when he made the decisions he did to participate in this crime, and recidivism is unlikely.

The Supreme Court has issued recent decisions supporting the science of crimes committed by

juveniles. In *Miller v. Alabama*, the United States Supreme Court discussed its earlier decisions,

explaining that:

> *Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform … they are less deserving of the most severe punishments. Those cases relied on three significant gaps between juveniles and adults. First, children have a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk-taking.

> Second, children are more vulnerable ... to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

567 U.S. 460, 471 (2012) (cleaned up). The Court's "decisions rested not only on common sense—on what 'any parent knows'—but on science and social science as well." *Id*. For example, in *Roper v. Simmons*, the Court relied on studies, like those discussed above, that indicated an adolescent's "risky or antisocial behaviors are fleeting" and "cease with maturity as individual identity becomes settled." 543 U.S. 551, 570 (2005). Consistent with the scientific literature, the Court observed that "[o]nly a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood." *Id*. With this in mind, the Court struck down the death penalty for offenders under eighteen at the time of the offense. *Id*. at 578-579. Several years later and relying on much of the same rationale, the Court held that juvenile life without parole sentences for nonhomicide convictions were unconstitutional. *Graham v. Florida*, 560 U.S. 48, 82 (2010).

In *Miller*, the Court held that the Eighth Amendment's prohibition against cruel and unusual punishment prohibited sentencing schemes that mandated life sentences without the possibility of parole for juvenile offenders. 567 U.S. 460, 479 (2012). The Court's decision turned on its concern that such sentencing schemes violated the principle of proportionality by depriving trial court judges of the ability to craft sentences that took into account the juvenile offender's "age and age-related characteristics and the nature of their crimes." *Id*. at 489.

In addition to his age, the Court must consider his family circumstances, including the loss of his parents at such a young age. The Tenth Circuit has repeatedly acknowledged that sentencing courts are mandated under § 3553(a) to consider family circumstances as part of a defendant's

"history and characteristics" when fashioning the appropriate sentence. *See, e.g., United States v. Vargas-Ortega*, 736 Fed. Appx. 761 (10th Cir. 2018) (unpublished) (reversing and remanding for resentencing where the district court erred in stating it could not vary downward based on family circumstances).

The proposed sentence of 17 years reflects that Luis experienced an extreme loss as a young child of 12 and committed the instant offense when he was still a teenager, at age 19. Thus, the sentence is consistent with the science and recidivism research concerning an offender's age at the time of the crime.

## CONCLUSION

For the reasons discussed above, Luis requests that the Court sentence him to 17 years of imprisonment, and three years of supervised release as such a sentence would be sufficient but not greater than necessary in light of the § 3553(a) factors..

Respectfully submitted,
The Law Office of Ryan J. Villa

*/s/ Ryan J. Villa*
RYAN J. VILLA
Counsel for Defendant
5501 Eagle Rock Ave. NE, Suite C2
Albuquerque, New Mexico 87113
(505) 639-5709
ryan@rjvlawfirm.com

## CERTIFICATE OF SERVICE

I certify that on March 5, 2024, I filed the foregoing electronically through the CM/ECF system, which caused all parties and counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Ryan J. Villa*
RYAN J. VILLA